No. 14829

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

JOHN V. SCHARA and MARDELL SCHARA,

                Plaintiff and Respondents and
                Cross-Appellants,

    vs.

THE ANACONDA COMPANY, a Delaware
corporation,

                Defendant and Appellant.

---

No. 14800

THE ANACONDA COMPANY,

                Relator,
    vs.

THE HON. JAMES D. FREEBOURN, DISTRICT JDUGE PRESIDING
IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT et al.,

                Respondents.

---

Appeal from:  District Court of the Second Judicial District,
            In and For the County of Silver Bow
            Honorable Judge James D. Freebourn and Honorable
            Judge Arnold H. Olson presiding.

Counsel of Record:

    For Appellant:

        Poore Law Firm, Butte, Montana
        Urban L. Roth argued, Butte, Montana

    For Respondent:

        McCaffery and Peterson, Butte, Montana
        John L. Peterson argued, Butte, Montana

---

                Submitted:  February 28, 1980
                Decided:  APR 24 1980

Filed:  APR 24 1980

Thomas Jr. Kearney
                Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

This is an appeal in which two actions have been consolidated. The first is a condemnation action brought by The Anaconda Company (Anaconda) to condemn approximately two acres of land in the Columbia Gardens Addition of Butte, Montana. The property sought to be condemned is owned by John and Mardell Schara (Scharas). The second is an action brought by the Scharas to enjoin Anaconda from allegedly violating the conditions of a restrictive covenant incorporated in deeds to lots in the Columbia Gardens Addition. Both actions were filed in the Silver Bow County District Court.

In the first action, the District Court entered incomplete findings and was thereafter directed by this Court to complete such findings.

In the second action, the District Court granted a mandatory permanent injunction enjoining Anaconda from violating the restrictive covenant which had attached to the Scharas' property. Anaconda moved for a stay of the injunction, but the motion was denied by the District Court. This Court granted Anaconda a temporary stay pending determination of the merits of this appeal.

Anaconda appeals from both District Court judgments, and the Scharas cross-appeal from the judgment entered in the condemnation action.

John and Mardell Schara are the owners of approximately 2.2704 acres of land, Lots 51, 52 and 54 of the Columbia Gardens Addition in Butte, Montana. On September 1, 1978, the Columbia Gardens Addition was incorporated under the Master Zoning Plan for Butte-Silver Bow and was zoned "M" for mining or industrial. Most of the 26 acres and the entire mineral estate within the Addition is owned by the Anaconda Company. The only access to the Scharas' property and the Addition is Montgomery Avenue. Anaconda owns all

of the land adjacent to Montgomery Avenue on both sides, plus all of Montgomery Avenue to the Columbia Gardens Addition. At the present time, the Scharas are the sole residents of the Addition. Since 1970, the Addition and its immediate neighborhood have undergone extensive changes, most of which have been prompted by Anaconda. The Columbia Gardens Amusement Park has been razed, the Continental East Pit operation located 300 to 400 feet from the Addition has commenced, an interstate highway has been constructed through the southeast corner of the Addition, the Berkeley Pit has expanded and a power line has been constructed through the north end of the Addition. The Anaconda Company has, upon several occasions, attempted to acquire the Scharas' property through negotiation and offers to purchase.

Anaconda instituted a condemnation proceeding against the Scharas to acquire their land for the purpose of establishing a dumping site for mining waste. In support of its claim, Anaconda presented evidence that it wished to expand its mining operations, that the expansion would require new techniques and expensive equipment, that it would be economically infeasible and impractical to dump waste on any other land, and that the land was essential to carrying out Anaconda's long term mining plan. Anaconda's testimony reveals that if the land is not acquired it would be infeasible to expand the Berkeley Pit eastward; consequently, mining would terminate within seven years due to exhaustion of the pit, shortening the life of mining in Butte by 14 years. Anaconda's mining plan requires that Montgomery Avenue as well as the Columbia Gardens Addition be inundated by overburden by the mid-1980's. The Scharas presented contradictory evidence of alternative dumping sites which were not as economically feasible for the mining operation but which were being contemplated by Anaconda if the Scharas' land could not be obtained. The Scharas also proffered testimony that Anaconda had made inconsistent statements

- 3 -

concerning future mining operations in its petition for the Woodville Road closure in 1977. Anaconda had stated at that time that with the road closure it could continue mining until about year 2000.

In the second action, the Scharas sought to enjoin Anaconda from violating one of the restrictive covenants placed upon their property. The covenant was the result of a trust agreement signed in 1950 between North Butte Mining Company, Anaconda's predecessor in interest, and all of the owners of Columbia Gardens Addition, one of whom was the Scharas' predecessor in interest. The trust instrument bound successors in interest and provided:

> "That in all conveyances, uses or permits there shall be a restriction upon the use of said premises that said premises shall be for residential use only and that no building, use or operation of the premises shall create or constitute a nuisance."

The District Court denied Anaconda's motion to stay the restrictive covenant proceedings until the outcome of the condemnation action, and Judge Olsen entered judgment against Anaconda on March 28, 1979. Pursuant to this judgment, a permanent injunction was issued which restrained Anaconda from using its property within the Columbia Gardens Addition for any purpose other than residential and from creating or maintaining a nuisance. The injunction also commanded Anaconda to remove an electric transmission line from the Addition and to repair or remove all vacated buildings located upon its property within the Addition.

Originally the District Court, in the condemnation action, the Honorable James D. Freebourn presiding, made the following findings of fact and conclusions of law on April 19, 1979:

> "5. At this date, plaintiff has nearly reached the maximum depth at which ore can be economically mined from the pit; the pit must be expanded horizontally in one direction or another; defendants' property lies east and south of the pit; expansion to the east and south, instead of some other direction, is compatible with the greatest public good and least private injury;

- 4 -

"   .   .   .

"10. Plaintiff's past, present and continuation
of future operations have and will accrue as a
benefit to the public and to the use of the public.
Acquisition of lots 51, 52 and 54 of the Columbia
Garden Addition, on substantial and satisfactory
estimations, now in evidence, will continue plain-
tiff's operations for some 13 or more years.

"11. Plaintiff has shown, by a preponderance of
the evidence, that the use and taking of said
lots is authorized by law; that the taking of said
lots is necessary to such use; that the need of
said lots is necessary to continue plaintiff's
mining operations and such taking, at this definite
and specific location, is being accomplished in
a manner which will be most compatible with the
greatest public good and the least private injury."

However, the court took judicial notice of the permanent

injunction issued on March 30, 1979, by the Honorable Arnold H.

Olsen in favor of the Scharas and against Anaconda concerning the

violation of restrictive covenants in the Columbia Gardens Addi-

tion. As a result, Judge Freebourn refused to enter a condemna-

tion award until this Court reviewed the permanent injunction

since such an award would amount to a reversal of Judge Olsen's

injunction.

Subsequently, Anaconda sought a writ from this Court to

direct Judge Freebourn to complete his findings and conclusions.

On July 11, 1979, this Court directed the District Court to enter

those conclusions. Judge Freebourn then made "amended and supple-

mental" findings of fact and conclusions of law in which he held

that Anaconda had "more than sufficient land for dumping purposes

and to continue its mining operations for some 14 or 15 years

without the need and necessity of the use of defendants' land,"

and further found that Anaconda's need for the Scharas' property

would not arise for some "14 or 15 years" in the future. The

District Court then concluded Anaconda had failed to prove its

need of the Scharas' property in the immediate future and because

of increases in land values over the last five years, the present

taking of the Schara property for "some 14 or 15 years in the

future, would deny defendants just compensation for such use."

The following issues are before us on appeal:

(1)  Whether the District Court was in error by denying Anaconda's motion to stay the restrictive covenant action until a final determination of the condemnation action;

(2)  In the alternative, whether the restrictive covenant is unenforceable due to the radical changes which have occurred in the Columbia Gardens Addition since 1950;

(3)  Whether the District Court abused its discretion by not having substantial evidence upon which to base its finding that no "necessity" will exist for Anaconda to condemn the Scharas' property for 14 or 15 years.

The Scharas raise the following issues on cross-appeal:

(1)  Whether the proposed condemnation is excessive;

(2)  Whether, by reason of the Hardrock Mining Act, a valid mining permit is an absolute condition precedent to condemnation for mining purposes;

(3)  Whether section 70-30-102, MCA, which distinguishes between copper mining and coal mining as a public use, is unconstitutional under the Equal Protection Clause.

Looking first to Judge Olsen's denial of Anaconda's motion to stay the covenant action pending the outcome of the condemnation proceedings, the heart of this issue is the effect that a restrictive covenant has upon a proceeding seeking a preliminary condemnation award.

Nichols on Eminent Domain discusses the issue as follows:

"5.73 Restrictive covenants.

"A rather perplexing situation arises out of the existence of what are commonly called 'building restrictions.'  A large tract of land is often cut up into lots and sold for residential purposes, and each lot is sold subject to restrictions against use for various purposes, the restriction upon each lot being for the benefit of all other lots in the same development or 'common plan or

- 6 -

scheme,' reasonable in their character, they are
enforced by courts of equity in favor of the
benefitted owner, so long as he continues to own
any part of the tract for the benefit of which the
restrictions were created, as well as in favor
of the owner of any one of the lots into which the
tract was divided, and against the owner of any of
the lots who attempts to disregard the restric-
tions. <u>Such restrictions do not, however, have an
inhibiting influence upon the right to exercise
the power of eminent domain . . .</u>" (Emphasis added.)
Nichols on Eminent Domain, §5.73.

This approach is consistent with Montana eminent domain
statutes. Section 70-30-103, MCA, provides that all real prop-
erty as well as all classes of private property may be taken
for public use when such taking is authorized by law, and section
70-30-104, MCA, states that "such estate or rights as may be
necessary up to and including a fee simple when taken . . . for
. . . a place for the deposit of debris or tailings of a mine . . ."
are " . . . subject to be taken for the public use."

In our present appeal, the restrictive covenant is at
most a part of the fee or something less than a fee. Therefore,
it is the proper subject of a condemnation proceeding. Once it
is determined that the property sought is a proper subject of
condemnation, the court must find that the taking is necessary
to the public interest and consistent with the greatest public
good and the least private injury.

We therefore conclude that a restrictive covenant action
is moot when a preliminary condemnation action involving the same
property is pending. If it is found that a preliminary condem-
nation award is proper, the condemnee may seek compensation which
takes into account the value of the property pursuant to the uses
allowed. On the other hand, if the condemnor is not entitled to
a preliminary condemnation award, the covenantee may proceed with
a suit on the restrictive covenant.

The District Court was in error by not granting the motion
to stay the restrictive covenant proceeding until the propriety

- 7 -

of the condemnation action was finally determined.

Since we find the restrictive covenant action moot, we need not reach the issue involving the unenforceability of a covenant when radical changes have occurred in the character of a neighborhood.

Next, with regard to the propriety of the District Court's denial of a preliminary condemnation order, it is Anaconda's contention that substantial credible evidence does not exist to support the finding of no necessity for condemnation.

Section 70-30-111, MCA, is entitled "Facts necessary to be found before condemnation." It provides, in pertinent part, " . . . [b]efore property can be taken, it must appear: (1) that the use to which it is to be applied is a use authorized by law; (2) that the taking is necessary to such use . . ." Section 70-30-110, MCA, states that the proposed condemnation "must be located in the manner which will be most compatible with the greatest public good and the least private injury."

From the preceding statutes the key determinations to be made are: (1) Whether the proposed use is "authorized by law," (2) whether "the taking is necessary", and (3) whether the location is the "most compatible with the greatest public good and the least private injury."

The determination involving whether the proposed use is "authorized by law" is easily made. Section 70-30-102, MCA, enumerates the public uses which are the proper subject of condemnation and therefore "authorized by law." Mining, except the strip mining of coal, is an authorized public use within section 70-30-102(15), MCA.

The determinations of whether the taking is necessary and whether it is compatible with the greatest public good and the least private injury both involve factual issues.

With regard to whether the taking is necessary, this

- 8 -

Court has consistently held that the necessity need not be absolute. Instead the test is "reasonable, requisite, and proper for the accomplishment of the end in view, under the particular circumstances of the case." Montana Power Co. v. Bokma (1969), 153 Mont. 390, 398, 457 P.2d 769, 774; State Highway Commission v. Yost Farm Co. (1963), 142 Mont. 239, 384 P.2d 277; Butte, A. & P. Ry. Co. v. Montana U. Ry. Co. (1895), 16 Mont. 504, 41 P. 232.

This Court made the following statement with regard to the determination of "necessity" and "the greatest good" and the "least private injury" in Montana Power Co. v. Bokma, supra.

> "The taking of private property by condemnation proceedings must be compatible with the greatest public good and the least private injury. . . The greatest good on the one hand and the least injury on the other are questions of fact to be determined in passing upon the question of necessity. . . These questions commonly arise in connection with the location of the proposed improvement. Since the condemnor has the expertise and detailed knowledge of considerations involved in determining location of the improvement, its choice of location is given great weight. . . Such choice will not be overturned except on clear and convincing proof that the taking has been excessive or arbitrary, it not being the function of the judiciary to determine as an engineer the best location of the proposed improvements. . . On the other hand when the condemnor fails to consider the question of the least private injury between alternate routes equal in terms of public good, its action is arbitrary and amounts to an abuse of discretion." (Citations omitted.) 153 Mont. at 399-400, 457 P.2d at 774-775.

According to the above approach the condemnor's (Anaconda's) choice of location is to be given great weight, it is to be overturned only by clear and convincing proof that the decision was excessive or arbitrary, and an abuse of discretion will be found if the condemnor fails to study alternatives. The record discloses that Anaconda studied all alternatives and rejected them as being economically infeasible. The District Court in its original findings found that Anaconda had "shown, by a preponderance of the evidence that the . . . taking is necessary . . . and will be most compatible with the greatest public good and

- 9 -

the least private injury." Mysteriously, in the court's amended and supplemental findings of fact and conclusions of law, the original findings remain intact, but the following inconsistent finding is added:

> "Plaintiff has failed to prove by a preponderance of the evidence the need and necessity of plaintiff for the use for mining of defendants' land in the immediate future and such need and necessity will not arise for some 14 or 15 years in the future."

Normally, the entry of inconsistent findings would require us to remand the case for further proceedings in the District Court; however here we find no evidence to support the court's latest findings and substantial evidence to support the initial findings. We conclude that the findings entered by the District Court on April 9, 1979, are correct and must be entered.

The record does disclose that mining in the present Berkeley Pit will be completed in 1986. In order to increase the life of future mining in Butte the Berkeley Pit must be expanded, and according to Anaconda's long term mining plan stripping of overburden must commence by 1983. Anaconda explains that new technology has been developed for removing overburden, and in order to have the equipment on line by 1983, immediate action is required. The equipment requires a tremendous investment and Anaconda must know the result of the condemnation action before it can be ordered.

It is further disclosed that Anaconda considered two alternatives to the condemnation of the Scharas' property. One alternative was backfilling the Berkeley Pit with overburden. This alternative was rejected since the long term mining plan contemplates vertically mining ore deposits located beneath the deepest portion of the Berkeley Pit. This future vertical mining plan is not now feasible because of both a lack of technology and current market conditions; however, it would be completely precluded if Anaconda backfilled the pit. The second alternative studied by Anaconda was the establishment of a dumping site on a portion of

its own land. Testimony reveals that although this alternative is feasible from an engineering standpoint, it is economically infeasible to transport the waste the distance involved. This leaves condemnation of the Scharas' land as the only feasible alternative to continue the life of mining in Butte.

The Scharas contend that since the preceding alternatives exist, condemnation of their land is not "necessary" nor "compatible with the greatest public good and the least private injury." We find this contention lacking in merit in light of Montana Power Co. v. Bokma, supra.

As a result, we find substantial credible evidence to support the findings entered by the District Court on April 19, 1979.

The Scharas contend on cross-appeal that the amount of property sought to be condemned is excessive. The basis for this argument is that Anaconda has recognized in its mining plan that a portion of the Scharas' land is within the Highway Department's proposed right-of-way for expansion of Interstate 15 and that Anaconda only contemplates use of the Scharas' property up to the proposed highway right-of-way.

Again this argument centers on absolute necessity, rather than the Montana test of necessity, "reasonable, requisite and proper for the accomplishment of the end in view, under the particular circumstances of the case." Montana Power Co. v. Bokma, supra. Testimony reveals that Anaconda would not use a small portion of the Scharas' land within the proposed highway right-of-way if the Highway Department does acquire it. Based on this testimony we cannot find that the proposed condemnation is excessive merely because Anaconda points out to the District Court that the Highway Department may have a superior claim to a small portion of the land. We find that condemnation of the Scharas' property is reasonable,

requisite, and proper for the accomplishment of the end in view under the peculiar circumstances of the case. The possibility that Anaconda may have to forfeit a small portion of the land to a superior claimant at a later date does not render the taking excessive.

The Scharas next contend on cross-appeal that since section 70-30-111, MCA, requires the use to be "authorized by law" before condemnation is allowed, the obtaining of a valid mining permit is a condition precedent to condemnation. However, there is nothing in either the Hardrock Mining Act, section 82-4-301, MCA, et seq., or the eminent domain statutes, section 70-30-101, MCA, et seq., to support this position. Section 70-30-102, MCA, declares mining to be a public use and it is unquestioned that Anaconda is allowed to engage in mining activities. To find that "authorized by law" requires that a mining company obtain a valid mining permit prior to condemnation would be inconsistent with Montana statutory authority and would be contrary to the public policy of providing expediency in eminent domain proceedings.

The Scharas' next issue on cross-appeal is that section 70-30-102(15), MCA, is unconstitutional. The statute provides, in pertinent part:

> "Public uses enumerated. Subject to the provisions of this chapter, the right of eminent domain may be exercised in behalf of the following public uses:
>
> " . . .
>
> "(15) to mine and extract ores, metals, or minerals owned by the plaintiff located beneath or upon the surface of property where the title to said surface vests in others. However, the use of the surface for strip mining or open pit mining of coal (i.e., any mining method or process in which the strata or overburden is removed or displaced in order to extract the coal) is not a public use, and eminent domain may not be exercised for this purpose . . ."
> (Emphasis added.)

It is contended that since the statute allows the mining of copper to be a public use and disallows the strip mining of

coal as a public use, there is/an unconstitutional violation of the Equal Protection Clause. However, it is well established that the equal protection clause is very limited in cases involving eminent domain statutes. This is especially so when the statute merely declares the legislative determination as to what is to be considered a public use. All that is required to survive an equal protection challenge in this context is that there be a "reasonable" basis for the distinction. Nichols on Eminent Domain, §4.15.

The legislature has provided its basis for the distinction between copper mining and coal mining in section 70-30-106, MCA, which provides:

> "70-30-106. Eminent domain not to be used for coal mining in certain cases--policy. For the following reasons the state's power of eminent domain may not be exercised to mine and extract coal owned by the plaintiff located beneath the surface of property where the title to the surface is vested in others:
>
> "(1) Because of the large reserves of and the renewed interest in coal in eastern Montana, coal development is potentially more destructive to land and watercourses and underground aquifers and potentially more extensive geographically than the forseeable development of other ores, metals, or minerals and affects large areas of land and large numbers of people.
>
> "(2) In many areas of Montana set forth in (1) hereinabove, the title to the surface is vested in an owner other than the mineral owner, and the surface owner is putting that surface to a productive use, and it is the public policy of the state to encourage and foster such productive use by such owner, and to permit the mineral owner to condemn the surface owner is to deprive the surface owner of the right to use his property in a productive manner as he determines and is also contrary to public policy as set forth in subsection (4).
>
> "(3) The magnitude of the potential coal development in eastern Montana will subject landowners to undue harassment by excessive use of eminent domain.
>
> "(4) It is the public policy of the state to encourage and foster diversity of land ownership, and the surface mining of coal and control of large areas of land by the surface coal mining industry would not foster public policy and further the public interest."

Based upon the immediately preceding legislative policy we find a reasonable basis for the distinction between copper mining and coal mining. We conclude that section 70-30-102(15) does not violate the Equal Protection Clause.

The judgments of the District Court in both actions are reversed. The restrictive covenant action is dismissed. The condemnation action is remanded to the District Court for entry of judgment of condemnation in accordance with this opinion.

_____
Chief Justice

We concur:

_____

_____

_____
Justices

Mr. Justice John C. Sheehy dissenting:

At the base of this Court's decision and that of Judge Freebourn in the condemnation action was the contention of the Anaconda Company that unless the Schara property were acquired by the company, the company's mining operations would be reduced from 20 years in the Butte area to 6 to 7 years of active life and we are told "this obviously would be disastrous for the public good of Butte-Silver Bow, Deer Lodge Counties and the State of Montana."

The closing threat is not new. It seems to me that I have heard this song before. It is from an old familiar score. We can only be sure that the decision to go or remain will not/ be dependent on the Schara property.

Judge Freebourn, when this Court forced him by mandate to make final findings of fact and conclusions of law so as to override Judge Olsen's restrictive covenant decision, found that "for dumping purposes" and to continue its mining operations for some 14 or 15 years, Anaconda has sufficient land already. Therefore he saw no need for the Schara property until some 14 or 15 years in the future and concluded that to permit condemnation now would deny them just compensation for the use of their land.

Although Rule 52, M.R.Civ.P. makes it mandatory that findings of a District Court shall not be set aside unless clearly erroneous, this Court through the majority opinion not only sets Judge Freebourn's findings aside, but proceeds to make findings of its own. There is ample support in the record that the Anaconda company owns a considerable area of land which could be used for dumping purposes, established in the cross-examination of Wilbur Crisswell. Moreover, Judge Freebourn had

- 15 -

before him the testimony regarding the East Continental Pit. The old highway leading to Woodville had been closed to permit the opening of the East Continental Pit, upon the representation that such closing of the highway would extend Butte's mining life for 22 years. East Continental Pit was abandoned after 2 years.

As a second point, I cannot permit myself to sign an opinion which finds it "reasonable" for eminent domain power to be granted to open-pit hard rock mining companies, but to be denied to open-pit coal mining companies. Every reason stated for denying eminent domain power to the coal mining industry in section 70-30-106, MCA, applies with equal force to the copper mining industry. There is no real distinction between an open-pit copper mine and an open-pit coal mine, except that the legislature favored cows over people. We give mere lip service to the equal protection clause of the federal constitution when we find a distinction without a difference in section 70-30-106.

For these reasons, I dissent.

John C. Shelhy
Justice

- 16 -