No. 98-369

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 334

CENEX PIPELINE LLC.,

Plaintiff and Respondent,

v.

FLY CREEK ANGUS, INC.,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Peter T. Stanley, Attorney at Law; Billings, Montana

For Respondent:

Allen D. Gunderson and Todd D. Gunderson, Gunderson Law Firm;

Billings, Montana

Submitted on Briefs: November 5, 1998

Decided: December 30, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1. Cenex Pipeline LLC filed a complaint in the District Court for the Thirteenth Judicial District in Yellowstone County for condemnation of a right-of-way over property owned by the defendant, Fly Creek Angus, Inc. Following a nonjury trial, the District Court issued findings of fact, conclusions of law, and an order, in which it allowed condemnation for a permanent pipeline and fiber optic line, as well as a right of access and a temporary construction easement. Fly Creek appeals. We affirm the judgment of the District Court.**

**¶2. Fly Creek presents six issues on appeal:**

**¶3. 1. Did the District Court err by allowing condemnation without specific identification of the access right-of-way?**

**¶4. 2. Did the District Court err when it allowed condemnation of a 50-foot easement?**

**¶5. 3. Did the District Court err when it allowed condemnation for a fiber optic line?**

**¶6. 4. Did the District Court err when it found that Cenex's pipeline route was not arbitrary and capricious?**

**¶7. 5. Did the District Court err when it ordered condemnation over the route proposed by Cenex, rather than over the Fisher property?**

**¶8. 6. Did the District Court err when it permitted the complaint for condemnation to proceed without prior proof of an environmental assessment?**

FACTUAL BACKGROUND

**¶9. Cenex Pipeline LLC owns an eight-inch pipeline that transports fuel between Laurel and Glendive. The pipeline was built over forty years ago and is currently in need of repair. Cenex wants to replace a 76-mile portion of the pipeline between Billings and Hysham, and in the process, shift the location of the pipeline from its**

current placement in the Yellowstone River Valley onto drier and less populated land. Pursuant to that goal, the initial conceptual and straight-line route that Cenex proposed for the new pipeline traversed a portion of ranch land owned by Fly Creek Angus, Inc., which is owned and operated by Anita and Rod McCloy.

¶10. When it selected the route, Cenex relied heavily on input from the approximately thirty-five landowners who were affected by the route. In combination with its own survey techniques, Cenex contacted landowners whose land it desired to cross with the pipeline and sought their suggestions about obstacles such as roads, river beds, and topography that might affect the precise location of the pipeline.

¶11. Representatives from Cenex first met with McCloys in January 1997, at which point they discussed placement of the pipeline over Fly Creek and the probable need to adjust the straight-line route in a number of places due to rugged terrain and McCloys' preferences. By that time, Cenex had already met with and begun work in order to gain approval of the project from the State Department of Environmental Quality and other state agencies.

¶12. In April 1997, Cenex representatives accompanied Rod McCloy and drove the proposed route over Fly Creek. Based upon its own observations of the terrain, as well as suggestions and the preferences of Rod, Cenex adjusted the route and eventually staked a new one. A month later, environmental experts joined Rod and the Cenex representative on another reconnaissance of the route, at which point they made further adjustments to accommodate a number of environmental concerns and Rod's suggestions.

¶13. Cenex had, for many months, been negotiating with other landowners about the final route and regarding the compensation that they would receive for giving Cenex the right-of-way. In fact, by August 1997, Cenex had reached agreement with every landowner except Fly Creek, and acquired rights over almost the entire pipeline route.

¶14. During this same period, an environmental assessment was being performed for the DEQ. The assessment evaluated the environmental impact of the new pipeline, and ultimately formed the basis for the DEQ's determination of whether a more comprehensive environmental impact statement would be necessary prior to

approval of the project. A draft assessment was published and issued to the public on August 1, 1997, and shortly thereafter a meeting was held in Hysham to receive public comment on the project; a written comment period was also established.

¶15. On August 7, 1997, Cenex completed the final survey regarding the Fly Creek route. On August 10, Rod suggested additional changes to the route, which had the effect of involving three new landowners; Cenex was able to reach an agreement with these new landowners. However, Fly Creek still did not accept Cenex's offer to purchase the right-of-way, even with these additional route changes. In fact, at the public meeting in Hysham on August 21, Rod made the additional suggestion that part of the pipeline be rerouted from the Fly Creek ranch onto property south of Fly Creek owned by Bill Fisher. Although he did not at that time discuss his proposal with Fisher, in September, Rod communicated the proposal directly to the individuals who were still in the process of performing the environmental assessment. Those persons, however, did not conduct an onsite investigation of the route that Rod suggested over Fisher's property.

¶16. On October 15, 1997, Cenex filed a complaint for condemnation against Fly Creek in the District Court for the Thirteenth Judicial District in Yellowstone County. Cenex alleged that pursuant to § 69-13-104, MCA, it had the authority to exercise the power of eminent domain, and that the taking was necessary based upon the public good and Fly Creek's rejection of its offer to purchase the right-of-way. Cenex sought a permanent easement and 50-foot right-of-way, including the right to construct and operate fiber optic cables, as well as a right of ingress and egress for access to the pipeline and a 25-foot temporary construction easement. The complaint did not refer to Fisher's property.

¶17. The DEQ published its environmental assessment on December 24, 1997. It stated that it "slightly preferred" the route on Fisher's land to the route proposed by Cenex. The DEQ's preference was based on the fact that the Fisher route was slightly shorter and better avoided streams and springs than the route proposed by Cenex. A period for public response was established. During that period, Fly Creek and others submitted responses. Neither Cenex nor Fisher were among those who submitted a response. Fisher testified that he did not even learn of Rod's proposal to reroute part of the pipeline over his property until January 1998, after the public response period had ended, and that had he been aware of it, he would have prepared a response to the DEQ. The record showed that he did not receive a copy of the environmental

assessment until after February 10, 1998. Fisher further testified that he initially told Cenex in approximately August 1997 that the steep terrain made it infeasible for the pipeline to traverse his property, and that he was not interested in giving Cenex a right-of-way. Testimony from Cenex similarly established that it had not considered the route over Fisher's property as a serious alternative.

¶18. After receiving the responses, the DEQ issued a final determination on February 5, 1998. The notice adopted the environmental assessment and found that an environmental impact statement was not necessary. It stated that it had examined three alternative routes, and that all three could receive state permits. The alternatives included: (1) the current right-of-way; (2) a right-of-way adjacent to Interstate Highway 94; and (3) the route proposed by Cenex. The DEQ noted that public comments suggested that the route proposed by Cenex be supplemented by the alternative route over Fisher's property, and it also stated that the route over Fisher's property was "slightly preferred to the proposed route." Cenex then effectively obtained all of the necessary permits to begin construction of the pipeline over its proposed route.

¶19. A three-day hearing was held in the District Court from March 30-April 1, 1998, during which the parties presented substantial testimony and documentary evidence regarding the pipeline and the development of the route proposed and sought by Cenex. Afterward, the parties submitted proposed findings of fact, conclusions of law, and orders.

¶20. The District Court found that it was in the public's best interest that the pipeline be moved from its current location. The District Court also found that Cenex had considered the terrain and the alternatives for relocation, and that the route which it developed had minimal impact on landowners and the environment and, therefore, was a reasonable and proper route. In reliance on the expert testimony, Fisher's own testimony, and a video presentation of the Fisher property, the District Court stated that the alternative route that Rod had suggested over Fisher's property was "not a practical alternative." It went on to conclude that Cenex was not arbitrary or capricious in its choice of a route for the pipeline, that the greatest public good requires the relocation of the pipeline, and that the least private injury would occur if the pipeline was placed along the route proposed by Cenex. Accordingly, it ordered the taking of the property and awarded Cenex the 50-foot permanent easement, as well as a temporary 25-foot construction easement and a right of access to the

**pipeline.**

## ISSUE 1

**¶21. Did the District Court err by allowing condemnation without specific identification of the access right-of-way?**

**¶22. We review a district court's findings of fact to determine whether they are clearly erroneous.** *See Interstate Prod. Credit Ass'n v. DeSaye* **(1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. We review a district court's conclusions of law to determine whether the interpretation is correct.** *See Carbon County v. Union Reserve Coal Co.* **(1995), 271 Mont. 459, 469, 898 P.2d 680, 686.**

**¶23. Fly Creek contends that Cenex failed in its complaint to identify properly the access right-of-way that Cenex sought by condemnation. On that basis, it contends that the District Court erred when it awarded Cenex the access easement and allowed condemnation of allegedly unidentified property. In addition, it asserts that the District Court's finding that a right of access was necessary is not supported in the record.**

**¶24. The description in question states:**

Access Roads. The right of ingress to and egress from the permanent easement over and across the real property of [Fly Creek] by means of roads and lanes thereon, if such there be, or otherwise by such practicable route or routes that shall occasion the least damage and inconvenience to the owner of the property.

Cenex contends that the need for access was based on the need to do annual testing of the pipeline and repair. It further contends that the right is phrased as it is in order to minimize the impact of Cenex's exercise of the right on Fly Creek. For example, Cenex asserts that while it would allegedly have the right to traverse the course of the easement in order to reach a specific testing or repair point on the pipeline, to actually execute its right in such a manner would be unnecessarily intrusive and destructive to that portion of Fly Creek's reclaimed land which would otherwise be left untouched if Cenex instead is allowed to use "roads and lanes thereon, if such there be, or otherwise by such practicable route or routes that shall occasion the least damage and inconvenience to [Fly Creek]."

¶25. Section 70-30-203(5), MCA, requires a complaint for condemnation to show "the location, general route, and termini and must be accompanied with a map" of the desired right-of-way. Section 70-30-203(6), MCA, requires that the complaint also state that the interest sought is the minimum necessary interest. Cenex included a map of the pipeline route and a description of the primary easement which Fly Creek, despite its other allegations of error regarding the condemnation process, apparently concedes meets the requirements of the statute. Moreover, there was testimony that Cenex would require for its own needs and the public safety access to the pipeline in order to maintain and repair it over time. Therefore, we reject Fly Creek's contention that the District Court's finding that a right of access was necessary was clearly erroneous.

¶26. Fly Creek is correct in its assertion that the description does not set forth a fixed way of access. However, we conclude from the nature of the access right and other considerations inherent to condemnation that Cenex's description of the right was as specific as it could or needed to be.

¶27. Cenex's point of access cannot be more accurately or specifically identified before the need for access arises. Because Cenex is only entitled to the "minimum necessary interest," the description of the secondary right of access merely complies with the statute through its incorporation of that requirement, albeit on a case-by-case basis. Accordingly, we conclude that the District Court did not err when it allowed condemnation of the access right-of-way.

## ISSUE 2

¶28. Did the District Court err when it allowed condemnation of a 50-foot easement?

¶29. As previously discussed, § 70-30-203(6), MCA, provides that a complaint for condemnation must include "a statement that the interest sought is the minimum necessary interest." We have also held that condemnation requires the plaintiff to prove, among other things, that the taking is necessary and that it is compatible with the greatest public good and the least private injury. *See Montana Power Co. v. Bokma* (1969), 153 Mont. 390, 457 P.2d 769. Fly Creek contends here that Cenex failed to show that a 50-foot right-of-way represented the minimum necessary interest, and asserts that in fact the width of the easement awarded by the District Court is "clearly excessive compared to what is actually needed by [Cenex]."

¶30. "The question of necessity is one of fact to be determined as other questions of fact in the light of all the evidence." *Bokma*, 153 Mont. at 397-98, 457 P.2d at 774. Fly Creek offers no support from the record for its assertion that the 50-foot easement is excessive. On the other hand, there is clear evidence that a 50-foot wide easement is the minimum necessary interest and, according to some testimony, 50-feet is not wide enough. Fly Creek contends that because Cenex contracted with some landowners for less than a 50-foot easement in places, 50 feet is not necessary. The record also reflects, however, that in those agreements, provisions were added to allow Cenex at least 50-feet of access when necessary.

¶31. It is not this Court's role to substitute its judgment for that of the district court in the determination of issues of fact. *See DeSaye*, 250 Mont. at 324, 820 P.2d at 1287-88. Accordingly, we conclude that there was substantial credible evidence to support the District Court's finding and award of a 50-foot easement.

## ISSUE 3

¶32. Did the District Court err when it allowed condemnation for a fiber optic line?

¶33. Fly Creek suggests that the District Court erred when, in spite of allegedly insufficient evidence, it found that a fiber optic line was necessary and awarded Cenex a fiber optic cable easement in "exactly the words sought by [Cenex]."

¶34. Section 69-13-103, MCA, states that a common carrier pipeline, as Cenex is in this case, has "[t]he right to lay, maintain, and operate pipelines, together with telegraph and telephone lines incidental to and designed for use only in connection with the operation of such lines." We conclude that the statute confers on Cenex the right to install a fiber optic line along with the pipeline, and that the record supports the District Court's finding that the fiber optic line is necessary.

¶35. The engineer manager from Cenex testified that "[f]iber optics is necessary--one of the necessary means for telecommunication along the pipeline system in order that we may remotely control the entire pipeline from a single location." Fly Creek relies on a narrow statement in August 1997 from the same Cenex official that Cenex did not have plans to install fiber optic cable. First, we note that the full context, from which the statement on which Fly Creek relies was taken, suggests that the possibility of installing fiber optic cable "may be considered [by Cenex] prior to actual

construction." Second, and more importantly, our role on review is to determine whether the District Court's finding is supported by substantial evidence, and not to review whether evidence was presented that might have supported a contrary finding. *See Wareing v. Schreckendgust* (1996), 280 Mont. 196, 210, 930 P.2d 37, 46. Accordingly, the evidence here is sufficient to support the District Court's finding, and we will not substitute our judgment for the District Court's.

¶36. Finally, it is not per se error for the District Court to have adopted in its findings and order the exact language used by Cenex. *See In re Marriage of Stufft* (1996), 276 Mont. 454, 457, 916 P.2d 767, 769. Especially in a case such as this, where the desired land rights are for very specific and limited purposes, it is not necessarily error for a district court to rely on and adopt the prevailing party's description of those rights. *See, e.g., Rathbun v. Robson* (1983), 203 Mont. 319, 324-25, 661 P.2d 850, 853. If the findings are supported by substantial credible evidence, as they are here, we will affirm the district court's finding.

ISSUE 4

¶37. Did the District Court err when it found that Cenex's pipeline route was not arbitrary and capricious?

¶38. Fly Creek contends that Cenex was arbitrary and capricious in the manner that it selected the pipeline route and, to the extent that the District Court's findings and conclusions suggest that it was not, Fly Creek contends that they are not supported by the record. Our review of the record leads us to conclude that Fly Creek's assertion is without merit.

¶39. There was substantial testimony in the record that Cenex worked at length with the landowners along its proposed route, including McCloys, to identify the best route for the pipeline. That process involved consideration of environmental factors, the landowners' preferences, topographical concerns, construction feasibility, and economic interests. The burden was on Fly Creek to present clear and convincing proof that Cenex's choice of the pipeline route was arbitrary and capricious. *See Schara v. Anaconda Co.* (1980), 187 Mont. 377, 386, 610 P.2d 132, 137; *Bokma*, 153 Mont. at 399, 457 P.2d at 775. We conclude that it failed to do so.

ISSUE 5

¶40. Did the District Court err when it ordered condemnation over the route proposed by Cenex, rather than over the Fisher property?

¶41. Fly Creek contends that because the DEQ's environmental assessment "slightly preferred" the proposed route on Fisher's property, Cenex, and consequently the District Court, were bound by that preference.

¶42. Fly Creek provides no legal authority for its position. Furthermore, the DEQ expressly stated that all of the routes that it considered qualified for permits and, in response to a letter from Cenex, the DEQ stated that it did "not believe that there is substantive authority under any of the applicable laws to mandate construction of one route over another." Accordingly, we conclude that the District Court did not err when it ordered condemnation over the route proposed by Cenex.

ISSUE 6

¶43. Did the District Court err when it permitted the complaint for condemnation to proceed without prior proof of an environmental assessment?

¶44. Fly Creek contends that Cenex initiated the condemnation proceedings in the District Court in October 1997, prior to the DEQ's completion of its final environmental assessment, and that the complaint should have been dismissed by the District Court because at the time that it filed the complaint, Cenex could not have begun construction of the pipeline, much less proven the necessary elements of condemnation. Cenex asserts that this Court has already decided precisely this question in *Schara*, 187 Mont. 377, 610 P.2d 132, pursuant to which Cenex contends that an environmental assessment need not be completed in order to seek condemnation.

¶45. We held in *Schara* that nothing in either the environmental or eminent domain statutes requires an authorized party to "obtain a valid [pipeline] permit prior to condemnation," and that to do so "would be inconsistent with Montana statutory authority and . . . contrary to the public policy of providing expediency in eminent domain proceedings." *Schara*, 187 Mont. at 388-89, 610 P.2d at 138. Fly Creek contends that this portion of *Schara* has been "impliedly reversed" by *Madison County v. Elford* (1983), 203 Mont. 293, 661 P.2d 1266. However, we disagree. Accordingly, we reject Fly Creek's suggestion that *Schara* does not apply, and hold

**that pursuant to *Schara*, Cenex was entitled to seek condemnation prior to completion of the final environmental assessment.**

**¶46. For the above reasons, we affirm the District Court's findings of fact, conclusions of law, and order.**

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART