No. 98-451

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 291

297 Mont. 66

991 P.2d 434

IDAHO ASPHALT SUPPLY, an Idaho

Corporation, MONTANA REFINING

COMPANY, a Montana Corporation,

and RIVERSIDE CONTRACTING, INC.,

a Montana Corporation,

Plaintiffs and Respondents

v.

STATE OF MONTANA, DEPARTMENT

OF TRANSPORTATION, an Agency of the

State of Montana,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Stephen Garrison, Lyle Manley, Department of Transportation, Helena, Montana

For Respondents:

Michael Uda, Colleen Coyle, Doney, Crowley & Bloomquist, Helena, Montana

_____

Submitted on Briefs: March 25, 1999

Decided: November 30, 1999

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 The Montana Department of Transportation (Appellant) appeals from the judgment of the District Court of the First Judicial District, Lewis and Clark County, ruling in favor of Idaho Asphalt Supply (Respondent) and ordering Appellant to pay $152,286.15, plus costs, prejudgment interest, and attorney's fees. Respondent cross-appeals from the District Court's adverse rulings on its summary judgment motion and claims alleging breach of contract, fraud, and negligent misrepresentation. We affirm in part, and reverse in part.

¶2 Appellant presents the following issues on appeal:

> I Whether the District Court erred in concluding that Appellant had waived its contract specification?

> II Whether the District Court erred by *sua sponte* finding a "waiver" of the contract specifications?

> III Whether the court erred in retroactively applying §18-1-404, MCA?

¶3 We restate Respondent's issues on cross-appeal:

> I Did the District Court err by denying Respondent's motion for summary judgment?

> II Did the District Court err in denying Respondent's claims for breach of contract, fraud, and negligent misrepresentation?

¶4 This suit arises out of a contract between Respondent and Appellant in conjunction with a highway construction project on a portion of I-90 near Clinton, Montana. In early November of 1993, Plaintiff Riverside Contracting, Inc. (RCI) submitted a bid for a contract with Appellant to construct the Clinton - East and West project (the Project). Later that month RCI and Appellant entered into a contract for the Project. That contract incorporated by reference Appellant's Standard Specifications, Supplemental Specifications, and Special Provisions, all of which were attached to the contract as part of the bid packet.

¶5 RCI subcontracted with Plaintiff Montana Refining Company (MRC) to supply polymer modified asphalt cement (PMAC) to the project. In early 1994, MRC apparently discovered it would be unable to supply the PMAC and in March 1994, contracted with Respondent to provide the material. The Purchase Agreement between MRC and Respondent contained the following provision: "[a]sphalt to be supplied on the above project shall conform to STATE OF MONTANA SPECIFICATIONS." The contract between Appellant and RCI required the PMAC to satisfy the ring-and-ball softening point test. This was set out in the "Special Provisions" portion of the contract.

¶6 The ring-and-ball softening point test involves heating two small samples of the PMAC

in a container of water or ethylene glycol. A metal ball is placed on top of each sample. The apparatus is heated and at some temperature, while the medium is being heated, the sample will soften and the ball will drop. The temperature at which each ball touches a bar near the bottom is called the "softening point." A high softening point is preferable to a low one. In addition, if the two balls drop at temperatures more than 2 degrees apart, the test is invalidated and must be repeated.

¶7 The test requires that the pouring temperature of the PMAC may not be more than 200 degrees Fahrenheit above the "expected softening point" of the asphalt. At trial, the parties and their witnesses disagreed over the meaning of "the expected softening point." The Special Provisions portion of the contract required that the minimum softening point must be no less than 130 degrees Fahrenheit, with a two percent tolerance.

¶8 The contract contained separate specifications for the "mix design" test of the PMAC. Prior to beginning the paving of any roadway construction project, Appellant conducts a process called mix design whereby Appellant's laboratory combines the materials to be used for the project in a mixer to determine whether they will result in a suitable road mix. The first step in this process is to send two quarts of the asphalt to be used in the project to Appellant's laboratory to determine whether it passes specifications prior to mixing. The procedures, temperatures, and tests pertaining to the mix designs and are not related to those for ring-and-ball softening point tests applied to the PMAC samples.

¶9 Respondent received from MRC an early draft Special Provision for PMAC which did not include a specification for the ring-and-ball softening point test. Respondent designed its PMAC to meet the specifications it was sent, but since it did not receive the ring-and-ball softening point specifications, it did not design its PMAC to meet that test. At the first mix design in March 1994, Respondent's PMAC did not pass mix design testing. The sample also did not pass the ring-and-ball softening point test.

¶10 Respondent reformulated and resubmitted the PMAC for testing at a second mix design on April 4, 1994. During this test for mix design, Appellant accepted a sample heated to a pouring temperature of 340 degrees. The reformulated sample passed testing for mix design. This sample, heated to a pouring temperature of 340 degrees for mix design purposes, also passed the ring-and-ball softening point test.

¶11 After Respondent's PMAC sample passed mix design testing, Respondent began shipping PMAC to the Project in late April 1994. The paving portion of the Project began

in late April and was finished by the end of May 1994. The contract required that asphalt samples be taken at the Project site, each sample representing a "lot" of the asphalt. During the Project, samples of Respondent's PMAC were taken from the field and sent to Appellant's asphalt properties laboratory to determine whether they were in compliance with the Project's specifications, including the ring-and-ball softening point test.

¶12 Samples of Respondent's PMAC from the Project began to fail the ring-and-ball softening point test almost immediately upon testing by Appellant's lab. According to Appellant, 19 of 25 lots of Respondent's PMAC did not pass the ring-and-ball test. The contract provided for reductions from Appellant's payments to Respondent in the case of failures in the quality of the PMAC to make up for its shorter life expectancy and inferior quality. Appellant penalized Respondent in the amount of $152,286.15 for lots 11-22.

¶13 The price reductions for the inferior PMAC were based on a contractual formula which depended, in part, on the magnitude of the failure. A softening point four degrees below the contract specifications would result in a smaller reduction than would a softening point 10 degrees below the specifications. Appellant voluntarily waived penalizing Respondent for lots 3-8 because it had failed to heat the samples in compliance with the requirements of the ring-and-ball test by heating the samples overnight instead of within two hours as required by the test.

¶14 The District Court found that it appeared that almost any sample could be heated to a high enough temperature to pass the ring-and-ball test. Therefore, heating the sample to a temperature higher than the PMAC's pouring temperature just so that the resulting ball drop temperature of the sample was at least 130 degrees would defeat the purpose of the test. To permit a sample to be heated higher than its pouring temperature would also unnecessarily degrade and age the material so that it would not be an accurate representation of the asphalt that was manufactured for use on the highway project.

¶15 Respondent disputed Appellant's price reductions on the basis that Appellant had improperly heated the samples taken from the Project to a pouring temperature of 330 degrees when performing the ring-and-ball softening point test, instead of the 340 degrees it had used when testing the sample at mix design, thereby causing samples taken from the Project to fail the ring-and-ball test.

¶16 Testimony showed that Appellant used a pouring temperature at or below 330 degrees because 330 degrees is the maximum temperature above the minimum softening point of

130 degrees (as required by the ring-and-ball test and under the contract) which a sample could be heated. Respondent argued that it was this refusal to heat the sample to 340 degrees which caused the samples to fail the ring-and-ball test, rather than inferior quality of the PMAC.

¶17 The District Court found that Respondent failed to prove Appellant acted fraudulently in its performance of the contract, failed to establish the nine elements of fraud, and failed to prove that Appellant acted fraudulently or negligently. The court then concluded that even though the contract expressly required Respondent's PMAC to satisfy the ring-and-ball softening point test, that Respondent had not breached the contract when its samples failed to do so. Citing *Kelly v. Lovejoy* (1977), 172 Mont. 516, 520, 565 P.2d 321, 324, the court concluded that Appellant had waived the temperature requirements of the contract when it accepted the April 1994 sample, which was heated to 340 degrees for the softening point test and therefore erroneously assessed price reductions against Respondent. The District Court awarded Respondent $152,286.15 plus costs and on the basis of a motion by Respondent, later amended its judgment to include prejudgment interest and attorney's fees.

> I Did the District Court err in concluding Appellant had waived its contract specification?

¶18 We review a district court's conclusions of law to determine whether the interpretation is correct. *Cenex Pipeline L.L.C. v. Fly Creek Angus, Inc.*, 1998 MT 334, ¶ 22, 292 Mont. 300, ¶ 22, 971 P.2d 781, ¶ 22. The District Court stated in its conclusions of law,

> [a]lthough the contract expressly required [Respondent]'s polymer asphalt samples to satisfy the ring-and-ball softening point test as set forth in Section 11(B) of the Special Provisions. . . [Appellant] waived the temperature requirement when it accepted the April 1994 sample which was heated to 340 degrees for the softening point test. . . [and] erroneously assessed price reductions against [Respondent].

¶19 The District Court correctly cited *Kelly* for the proposition that waiver is a voluntary and intentional relinquishment of a known right, claim or privilege which may be proved by express declarations or by a course of acts and conduct so as to induce the belief that the intention and purpose was to waive. See *Kelly*, 172 Mont. at 520, 565 P.2d at 324.

¶20 In *Kelly*, a covenant restricted the possession of livestock by landowners in a Billings subdivision. Residents in the subdivision had a history of maintaining horses on their property in violation of the covenant. Kelly, prior to moving into the subdivision, was aware of Lovejoy's maintenance of horses on his property, but acquiesced to the horses' presence. *Kelly*, 172 Mont. at 519, 565 P.2d at 323. After a dispute arose between the two parties over the Kellys' barking dog, the Kellys filed a suit against the Lovejoys to enjoin them from maintaining horses on their property in violation of the covenant. We held that the Kellys' admitted acquiescence to the presence of Lovejoys' horses constituted a waiver and estopped them from enforcing the restrictive covenant against the Lovejoys. *Kelly*, 172 Mont. at 520, 565 P.2d at 323-24. We concluded that the Kellys, who were aware of the covenant prior to the purchase of their home, voluntarily and intentionally waived their right to enforce the covenant against the Lovejoys by their "acquiescence in the presence of the horses." *Kelly,* 172 Mont. at 520, 565 P.2d at 324.

¶21 In this case, unlike the Kellys' waiver of their right to enforce the restrictive covenant by acquiescence, the Appellant did not, by accepting one PMAC sample heated to a pouring temperature of 340 degrees *for purposes of mix design testing*, voluntarily and intentionally waive its right to enforce the temperature specifications in the contract regarding ring-and-ball testing.

¶22 Most recently, we held that a college professor who had signed nineteen, one-year contracts and cashed paychecks over a period of nineteen years without complaint of "no conversion compensation," together with his acceptance of a retirement agreement and his promise not to pursue a past wage grievance, constituted a waiver of any claims he may have had against his employer arising from salary or wages due him as a result of his employment. See *Sperry v. Montana State University* (1989), 239 Mont. 25, 778 P.2d 895.

¶23 This Court has stated that "waiver is mainly a question of intention and must be manifested in some unequivocal manner. . . ." *Thiel v. Johnson* (1985), 219 Mont 271, 274, 711 P.2d 829, 832 (citing *Northwestern Fire & Marine Insurance Company v. Pollard* (1925), 74 Mont. 142, 238 P. 594). "Whether there has been such acquiescence as to defeat the enforcement of a valid restriction depends upon the circumstances of each case and the character and materiality of the permitted breach." *Kelly*, 172 Mont. at 520, 565 P.2d at 324 (citing *Kosel v. Stone* (1965), 146 Mont. 218, 404 P.2d 894). The character and materiality of Appellant's single act of accepting a PMAC sample heated to 340 degrees for mix design testing does not constitute waiver in a way it would if Appellant had itself heated 24 of 25 samples to 340 degrees for ring-and-ball testing.

¶24 For the District Court to properly find that Appellant had "waived the temperature requirement when it accepted the April 1994 sample which was heated to 340 degrees for the softening point test," the record must show that Appellant, in an unequivocal manner, intentionally and voluntarily relinquished the right to enforce the requirement that Respondent's samples conform to the temperature requirement of the ring-and-ball test. Such relinquishment may be proved either by express declarations or by a course of acts and conduct so as to induce the belief that Appellant's intention and purpose was to waive its rights. See *Kelly,* 172 Mont. at 520, 565 P.2d at 324.

¶25 The PMAC sample in question was heated to a pouring temperature of 340 degrees in April for the <u>mix design</u> test. As the District Court found,

> [t]he contract contained separate specifications for the mix designs of the polymer asphalt cement. The procedures, temperatures, and tests pertaining to the mix designs had *no relation to those for the ring-and-ball softening point tests* applied to the polymer asphalt cement samples (emphasis added).

¶26 Because the mix design test and the ring-and-ball test were different tests with different specifications, the pouring temperatures Appellant heated the sample to for mix design had no relation to those to be used in future ring-and-ball tests. Appellant's acceptance of one sample which was heated to 340 degrees for the purposes of the mix design test did not waive the temperature requirement for all future ring-and-ball softening point tests.

¶27 Evidence in the record fails to show that a one time acceptance is an "intentional relinquishment" of the right to enforce the temperature requirement of the ring-and-ball test expressly required by the Special Provisions portion of the contract. Conversely, the record shows that Appellant expressly refused to heat samples to 340 degrees for ring-and-ball tests, even when requested by Respondent. Such refusal explicitly contradicts a finding of an intentional relinquishment of the right to enforce the contract provisions and could not have induced the belief that their intention and purpose was to waive the temperature requirement of the contract. See *Kelly*, 172 Mont. at 520, 565 P.2d at 324.

¶28 Appellant's acceptance of one sample heated to 340 degrees for mix design testing is not a "course of acts and conduct" sufficient to induce the belief by Respondent that Appellant's intention and purpose was to waive the temperature requirement specifically mandated by the ring-and-ball test. *Kelly*, 172 Mont at 520, 565 P.2d at 324. Appellant's

refusal to heat samples above a maximum of 330 degrees (a limit imposed by the ring-and-ball test) is antithetical to a waiver "manifested in an unequivocal manner." *Thiel,* 219 Mont. at 274, 711 P.2d at 832. Therefore, the District Court's conclusion that Appellant had waived its right to enforce the temperature requirements stated in the contract is incorrect as a matter of law.

¶29 Based on the foregoing, we hold that Appellant did not waive the temperature requirements of the contract when it accepted the April 1994 sample which was heated to 340 degrees and reverse the District Court on that issue. Accordingly, we reverse the District Court's award to Respondent of $152,286.15, plus costs, prejudgment interest, and attorney's fees. As a result, we need not reach the issue of whether the District Court erred in retroactively applying § 18-1-404, MCA.

¶30 In view of the above holding, we need not address the issue of whether the District Court erred by *sua sponte* finding a waiver of the contract specifications.

> I. Did the District Court err by denying Respondent's motion for summary judgment?

¶31 "Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Ross v. City of Great Falls*, 1998 MT 276, ¶ 9, 291 Mont. 377, ¶ 9, 967 P.2d 1103, ¶ 9 (citing *Ash Grove Cement Co. v. Jefferson County* (1997), 283 Mont. 486, 491, 943 P.2d 85, 88). See also Rule 56(c), M.R. Civ.P. We review a district court's grant of summary judgment de novo, applying the same Rule 56(c), M.R.Civ.P. criteria as the district court. *Ash Grove Cement Co.*, 283 Mont. at 491, 943 P.2d at 88.

¶32 In the usual summary judgment case, we first determine whether "the moving party met its burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law." *Ross*, ¶ 10. In this case, the parties agree on the material facts. The question before this Court is whether the District Court correctly concluded that Respondent was not entitled to summary judgment as a matter of law. We review a district court's conclusions of law to determine whether the interpretation of the law is correct. *Ross*, ¶ 10.

¶ 33 Respondent's Motion for Summary Judgment raised two issues; 1) whether Appellant was required by the contract to take and test "retain samples" of the asphalt cement for

properties other than penetration, before assessing price reductions against Respondent, and; 2) whether Appellant conducted proper sampling and used the proper formula for assessing price reductions.

¶34 The parties did not dispute that Appellant did not conduct retain sampling prior to assessing price reductions against Respondent. The parties likewise, did not dispute that the material (PMAC) and testing at issue is asphalt cement being tested for other than penetration. The contract between the parties required sampling and testing in accordance with the contract provisions. Those provisions do not require Appellant to take "retain samples" prior to assessing price reductions. It is not clear from the evidence which was before the District Court at the time it ruled on Respondent's motion for summary judgment, whether Appellant conducted proper sampling and used the proper formula for assessing price reductions under the contract. Therefore, we determine that the District Court did not err by denying Respondent's motion for summary judgment.

> II Did the District Court err in denying Appellant's claims for breach of contract, fraud, and negligent misrepresentation?

¶35 The District Court stated in its Findings of Fact;

> [Respondent] failed to prove that [Appellant] acted in bad faith in its performance of the contact. . . failed to establish a "special relationship" between the parties, which is a prerequisite to a recovery for the tort of breach of the covenant of good faith and fair dealing in a contractual relationship. . . failed to prove that [Appellant] acted fraudulently in its performance of the contract. . . failed to establish the nine elements of fraud. . . [and] failed to prove that [Appellant] acted fraudulently or negligently.

¶36 We review a district court's findings of fact to determine whether they are clearly erroneous. *State v. Wooster,* 1999 MT 22, ¶ 2, 293 Mont. 195, ¶ 2, 974 P.2d 640, ¶ 2 (citing *Interstate Production Credit v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287). This Court has adopted a three_part test to determine whether a district court's finding of fact is clearly erroneous. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, this Court is left with a definite and firm conviction that a mistake has been made. *In re Estate of Hunsaker*, 1998 MT 279, ¶ 26, 291 Mont. 412, ¶ 26, 968 P.2d 281, ¶ 26 (citing *DeSaye*, 250 Mont. at 323, 820 P.2d at

1287).

¶36 The District Court concluded that Respondent had not proved its claims against Appellant for negligence, fraud, misrepresentation and bad faith and therefore its claims should be denied. Respondent's success on such claims appears inextricably linked to a showing that Appellant promised Respondent it would heat PMAC samples for future ring-and-ball tests to 340 degrees. After a review of the record, we find no evidence that Respondent has succeeded in making such a showing. As a result, we cannot conclude that the District Court's findings are clearly erroneous. We affirm the District Court's denial of Respondent's claims for breach of contract, fraud, and negligent misrepresentation.

¶37 Affirmed in part, reversed in part.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER