No. 02-523

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 125

LYLE LEROY TVEDT, and
L. L. TVEDT INSURANCE, INC.,

        Plaintiffs and Appellants,

    v.

FARMERS INSURANCE GROUP OF COMPANIES;
FARMERS INSURANCE EXCHANGE; TRUCK
INSURANCE EXCHANGE; MID-CENTURY
INSURANCE COMPANY; FARMERS NEW
WORLD LIFE INSURANCE COMPANY; and
FARMERS GROUP, INC.,

        Defendants and Respondents.

APPEAL FROM:    District Court of the Fourth Judicial District,
                     In and For the County of Missoula, Cause No. DV 2001-981,
                     Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Curtis G. Thompson, Thompson, Potts & Donovan, Great Falls, Montana

        For Respondents:

                Mark D. Parker, Parker Law Firm, Billings, Montana

                        Submitted on Briefs:  April 3, 2003

                                Decided:  May 12, 2004

Filed:

                      _____
                                 Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Plaintiffs Lyle LeRoy Tvedt and L. L. Tvedt Insurance, Inc. (Tvedt), appeal the May 23, 2002, opinion and order of the Fourth Judicial District Court, Missoula County, wherein the court granted summary judgment in favor of Farmers Group of Companies (Farmers) on his claims for breach of contract, wrongful discharge, and indemnification of employment expenses. We affirm in part and reverse in part.

¶2 Tvedt presents the following issues on appeal:

¶3 1. Did the District Court err in granting summary judgment to Farmers on Tvedt's two breach of contract claims: (a) the implied covenant of good faith and fair dealing; and (b) waiver of the "at will" termination clause?

¶4 2. Did the District Court err in granting summary judgment to Farmers on Tvedt's wrongful termination claim?

¶5 3. Did the District Court err in dismissing Tvedt's claims for business expense indemnification?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Tvedt commenced working as an insurance agent for Farmers in 1978. Eight years later, on December 1, 1986, when Farmers offered Tvedt the position of District Manager in Missoula, Tvedt entered into a contract with Farmers called the District Manager's Appointment Agreement (Manager's Agreement). The Manager's Agreement appointed Tvedt as "District Manager."

¶7     On February 10, 2000, after serving thirteen years as District Manager, Tvedt formed a corporation called  L. L. Tvedt Insurance, Inc., which, according to his affidavit, was for the purpose of facilitating operation of an incorporated insurance agency for tax purposes.

¶8     On January 8, 2001, a second agreement, called Corporate District Manager Appointment Agreement (Corporate Agreement), was entered into, this time between L. L. Tvedt Insurance, Inc., and Farmers.  The Corporate Agreement appointed L. L. Tvedt Insurance Agency, Inc., as "District Manager," and Tvedt, individually, as "Supervising District Manager."

¶9     The Manager's Agreement and the Corporate Agreement (collectively, Agreements) contained several mutual clauses applicable to this appeal.  Both agreements contained an "at will" termination clause which permitted cancellation of the agreement by either party without cause on thirty days' written notice.  Further, both agreements contained a "contract value" clause which established a liquidated value of the contract based upon years of service with the company.  The Corporate Agreement provided that, in the event Farmers terminated the agreement, Farmers would pay the liquidated sum to the terminated party. The Manager's Agreement also required a compensation payment by Farmers upon termination, but provided that an amount less than the "contract value" could be negotiated by the parties.  Both agreements contained an "independent contractor" clause which stated that nothing in the agreement was intended to create an employer-employee relationship, but, rather, that district managers worked in the capacity of an independent contractor.

¶10    In 1996, Farmers published *District Manager Performance Standards and Expectations* (*Standards*) which set forth standards for district managers, including Tvedt. In 1998, Farmers published a second edition of the *Standards* which included, *inter alia*: (1) a clause indicating the *Standards* would be applied to determine renewability of district managers' contracts, and (2) a clause indicating the *Standards* in no way modified Farmers' right to terminate on thirty days' notice.

¶11    Tvedt has maintained throughout the dispute with Farmers that, as District Manager, he met and often exceeded the criteria delineated in the *Standards*. Tvedt asserted that in the year 2000, his production of insurance sales exceeded the production quotas, as follows: 163 percent of life insurance, 128.4 percent of automobile insurance, 104.4 percent of commercial insurance, and 109.1 percent of fire insurance. In the first three months of 2001, Tvedt alleged similarly high percentages.

¶12    Nonetheless, on March 6, 2001, Tvedt received the first of a series of letters from Bruce H. Gordon, Division Marketing Manager for Farmers, criticizing his performance as District Manager. Shortly thereafter, on May 16, 2001, Tvedt received a termination letter from David Dela Torre, State Executive Director for Farmers, giving him thirty days' written notice of termination of employment, without cause, effective June 15, 2001. Enclosed with the termination letter was a Notice of Termination of Appointment Agreement(s) and Agencies which stated:

> Please be advised that any and all appointment agreements and any and all agencies existing between you and the undersigned, and any and all appointments, whether as District Manager or as District Agency of and for the undersigned, are hereby terminated pursuant to the terms of said

4

agreement(s); said termination to be effective as of the termination date shown above [June 15, 2001] without further notice.

On June 28, 2001, Farmers issued, at Tvedt's request, another termination letter along with another Notice of Termination of Appointment Agreement(s) and Agencies, which extended the effective termination date to June 30, 2001.

¶13 Pursuant to their agreements, Farmers calculated Tvedt's "contract value" to be $313,225.00 on the basis that Tvedt, at the time of termination, had worked fourteen years, seven months for Farmers. On August 13, 2001, Farmers issued Tvedt a check representing the first of four equal "contract value" installment payments. Although the record makes reference to further payments, the total amount which has been paid to Tvedt is not specified therein.

¶14 On December 12, 2001, Tvedt brought a three-count complaint against Farmers for breach of contract, wrongful termination, and indemnification of expenses. Tvedt alleged Farmers had breached the covenant of good faith and fair dealing, had waived the "at will" clauses in the Agreements by its actions, and had erroneously characterized him as an "independent contractor" rather than an "employee." Claiming employee status, Tvedt sought relief under Montana's Wrongful Discharge from Employment Act (WDEA), set forth in § 39-2-901, *et seq.*, MCA.

¶15 On February 13, 2002, Farmers moved for summary judgment. On May 8, 2002, while its motion for summary judgment was still pending, Farmers filed an answer and contingent counterclaim whereby the counterclaim would not be pursued if the District Court dismissed Tvedt's complaint pursuant to Farmer's outstanding motion for summary

5

judgment. Farmers' counterclaim stated that, in the event the District Court found that Tvedt was an "employee" of Farmers, then Farmers' obligations to pay Tvedt his "contract value" should cease, and all payments to Tvedt should be returned.

¶16    On May 23, 2002, the District Court entered its opinion and order granting Farmers' motion for summary judgment on all claims. Tvedt appeals.

## STANDARD OF REVIEW

¶17    This Court's standard of review in appeals from summary judgment rulings is *de novo*. *Meyer v. Creative Nail Design, Inc.,* 1999 MT 74, ¶ 13, 294 Mont. 46, ¶ 13, 975 P.2d 1264, ¶ 13. *See also Treichel v. State Farm Mut. Auto. Ins. Co.* (1997), 280 Mont. 443, 446, 930 P.2d 661, 663 (citing *Motarie v. Northern Mont. Joint Refuse Disposal Dist.* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156). This Court reviews a summary judgment order entered pursuant to Rule 56, M.R.Civ.P., based on the same criteria applied by the district court. *Meyer*, ¶ 13; *Treichel,* 280 Mont. at 446, 930 P.2d at 663.

¶18    In proving that summary judgment is appropriate:

> [t]he movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. [This Court] review[s] the legal determinations made by a district court as to whether the court erred.

*Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264-65, 900 P.2d 901, 903 (citations omitted). In order to be granted summary judgment, the "moving party has the burden of showing a complete absence of any genuine issue as to all facts considered material in light

of the substantive principles that entitle the moving party to judgment as a matter of law and all reasonable inferences are to be drawn in favor of the party opposing summary judgment." *Meyer*, ¶ 15 (citing *Kolar v. Bergo* (1996), 280 Mont. 262, 266, 929 P.2d 867, 869).

## DISCUSSION

### Issue 1

***¶19     Did the District Court err in granting summary judgment to Farmers on Tvedt's two breach of contract claims: (a) the implied covenant of good faith and fair dealing, and (b)  waiver of the "at will" termination clause?***

¶20     Tvedt alleges that Farmers breached both Agreements by terminating the contracts without good cause and with inadequate notice, constituting a breach of the covenant of good faith and fair dealing implicit in both Agreements.  We first address Tvedt's assertion that Farmers breached the Agreements on grounds of inadequate notice.  Tvedt asserts that he received the first notice of termination on May 16, 2001, with an effective date of June 15, 2001, but Farmers did not follow through on that termination.  By June 28, 2001, Tvedt contends he was still district manager.  On June 28, 2001, Farmers sent Tvedt another letter and notice of termination with an effective date of June 30, 2001.  This, according to Tvedt, amounted to a two-day notice of termination which was contrary to the thirty-day notice provision, thus constituting a breach of contract.  Farmers asserts that it voluntarily extended the termination notice for fifteen days from June 15th to June 30th at Tvedt's request.  In a letter from Farmers to Tvedt dated June 28, 2001, Farmers wrote:

> Mr. Tvedt: Please be advised on May 16, 2001, we gave you a notice of termination to be effective June 15, 2001.  This termination date has been extended 15 days after further discussion with you for personal reasons effective June 30, 2001 . . . .

7

¶21 The record reflects that the District Court made specific inquiry at the summary judgment hearing regarding the reason the termination date was extended from June 15, 2001, to June 30, 2001:

Court: And . . . this was at his request the additional 15 days be given?

Counsel: Yes . . . that's when he wanted to be terminated. I mean he says let's make it effective that day. Instead of two weeks ago, let's make it effective the end of the month.

Court: And Mr. Tvedt's affidavit doesn't dispute that.

Counsel: No.

Thus, the District Court did not err in concluding no breach occurred based on notice. The fact Tvedt was granted an additional fifteen days before his position would terminate did not constitute inadequate notice under the terms of the Agreements.

### *Implied Covenant of Good Faith and Fair Dealing*

¶22 Tvedt asserts the District Court erred in concluding the "at will" termination clauses precluded a finding that Farmers breached the implied covenant of good faith and fair dealing. Tvedt further asserts the District Court erred in disregarding substantial evidence that Farmers used discretion conferred on it by the Agreements in an unreasonable manner to act dishonestly or outside accepted commercial practices, contrary to the mandates of the implied covenant of good faith and fair dealing, which deprived him of the benefit of the contracts.

¶23 Farmers counters that it did not exercise discretion in terminating Tvedt, but rather a a right. Therefore, Farmers contends it did not breach the covenant of good faith and fair

dealing. Farmers alleges that, according to the "at will" termination provisions, it was at liberty to terminate Tvedt on thirty days' notice, with or without cause. Furthermore, Farmers argues that according to the language of the Agreements, it did not need a reason to terminate Tvedt, and, by signing the Agreements, Tvedt conceded as much.

¶24 In its order granting Farmers' motion for summary judgment, the District Court found no breach of the implied covenant of good faith and fair dealing with respect to either agreement, setting forth several relevant standards recognized by this Court for contract interpretation:

> We must interpret the intent of parties to a contract from only the contract when the terms are unambiguous. *See Habets v. Swanson*, 2000 MT 367, ¶ 13, 303 Mont. 410, ¶ 13, 16 P.3d 1035, ¶ 13. "An ambiguity exists when the contract taken as a whole in its wording or phraseology is reasonably subject to two different interpretations." *Wray v. State Compensation Ins. Fund* (1994), 266 Mont. 219, 223, 879 P.2d 725, 727 (quoting *Morning Star Enterprises v. R. H. Grover, Inc.* (1991), 274 Mont. 105, 111, 805 P.2d 553, 557). Whether a contract is ambiguous is a question of law that a court must decide. *See Carelli v. Hall* (1996), 279 Mont. 202, 209, 926 P.2d 756, 761.

¶25 With these provisions in mind, the District Court then examined the "at will" provisions of both the Manager's and the Corporate Agreements. The District Court found no ambiguity in the "at will" provision of the Manager's Agreement, which stated "[this Agreement . . . may be cancelled without cause by either the District Manager or the Companies on 30 days written notice . . . ," or the Corporate Agreement, which stated, "[t]his Agreement may be canceled with or without cause by either the District Manager Agency or the Companies on thirty 30 days written notice."

¶26 Tvedt argues, however, that even though the Agreements contained this language, the covenant of good faith and fair dealing is not negated by the "at will" termination provisions. He contends that where, as alleged here, an employer uses discretion conferred by contract to act dishonestly or outside accepted commercial practices to deprive an employee of the benefit of the contract, the covenant of good faith and fair dealing is breached despite the existence of an "at will" provision.

¶27 This argument relies on the fifth prong of the framework for breach of implied covenant claims as set forth in *Weldon v. Montana Bank* (1994), 268 Mont. 88, 885 P.2d 511:

(1) every contract contains an implied covenant of good faith and fair dealing; (2) a breach of the covenant is a breach of the contract; (3) a breach of an express term of the contract is not a prerequisite to a breach of the implied covenant; (4) the conduct required by the implied covenant is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade; and (5) *when one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached.*

*Weldon,* 268 Mont. at 94, 885 P.2d at 515 (emphasis added). In support of their respective positions, both parties cite *Weldon* for the proposition that, in the absence of contract-conferred discretion, it is questionable whether a breach of the covenant occurs:

Without some attempt by one party to "[use] discretion conferred by the contract to act dishonestly or to act outside the accepted commercial practices to deprive the other party of the benefit of the contract," it is questionable whether any breach of the covenant occurred, even if the conduct amounts to breaches of other common law obligations.

*Weldon*, 268 Mont. at 95, 885 P.2d at 515 (quoting *Shupak v. New York Life Ins. Co.* (D. Mont. 1991), 780 F. Supp. 1328, 1342 (alteration in original)(citing *Story v. City of Bozeman* (1990), 242 Mont. 436, 450, 791 P.2d 767, 775)). Tvedt contends Farmers' general

discretion to terminate the Agreements was subject to the implied covenant of good faith and fair dealing. Farmers, however, contends the Agreements conferred no discretion, and that, according to express language contained therein, it could terminate on a thirty days' notice, with or without cause.

¶28 The holdings in several decisions of this Court support Farmers' position. In *Farris v. Hutchinson* (1992), 254 Mont. 334, 838 P.2d 374, where an employer did not renew an employee's one-year employment contract pursuant to a non-renewal provision of the contract, we held that an implied covenant claim could not be sustained because the employer had terminated the employee, without cause, under an express provision of the contract. *Farris*, 254 Mont. at 338, 838 P.2d at 376. Similarly, in *Prout v. Sears, Roebuck & Co.* (1989), 236 Mont. 152, 772 P.2d 288, and *Stark v. Circle K Corp.* (1988), 230 Mont. 468, 751 P.2d 162, where at-will employees had signed written agreements permitting termination with or without cause, we gave effect to the written agreements by permitting the employer to terminate without cause thereunder. *Prout*, 236 Mont. at 158, 772 P.2d at 292; *Stark*, 230 Mont. at 476, 751 P.2d at 167.

¶29 *Prout* and *Stark* addressed terminations which were purportedly "with cause," in contrast to the "without cause" termination at issue here. Nonetheless, "[i]n *Prout* we gave effect to the written agreements and said the employer could fire without cause under the agreements, but that if it asserted the termination was for cause, the employee must have an opportunity to prove that the cause stated was false." *Farris*, 254 Mont. at 339, 838 P.2d at 377. Likewise, in *Stark,* we allowed the jury to decide, given the employer's termination

11

based upon cause, "whether or not the employer had cause and had followed its own policies." *Farris*, 254 Mont. at 339, 838 P.2d at 377. However, "[t]he eventual determination of these factual issues in *Stark* and *Prout* did not and would not contradict the express wording of the respective agreements," which would have allowed termination without cause, and we limited the application of the implied covenant to "the interpretation of the words 'with cause' and the discretion of the employer thereunder." *Farris*, 254 Mont. at 339, 838 P.2d at 377. Thus, in both cases, the implied covenant addressed the interpretation of the words "with cause" only, and not a factual situation where, as here, the employer gave no stated cause for the termination pursuant to an express contractual provision.

¶30 Like the employers in *Farris*, *Prout*, and *Stark*, Farmers not only had included an express "at will" termination clause in both Agreements, but also had further stated in the *Standards* that "[t]his program in no way modifies the Companies' right to terminate on 30 days' notice, with or without cause, anytime during the measurement cycle." Tvedt, like the employees in each of these cases, was aware that the potential existed for termination upon thirty days' notice.

¶31 As we have stated, "[a]n agreement made in writing cannot be altered except in writing or by an executed oral agreement, and not otherwise." *Farris*, 254 Mont. at 338, 838 P.2d at 376. In *Farris*, we quoted with approval the Supreme Court of the State of California in its determination of how the implied covenant of good faith and fair dealing should be applied:

12

> We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. "The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract 'an implication . . . should not be made when the contrary is indicated in clear and express words.' Corbin, Contracts, § 564, p. 298 (1960) . . . . [¶] As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach."

*Farris*, 254 Mont. at 338-39, 838 P.2d at 376-77 (citing *Carma Developers Inc. v. Marathon Development California, Inc*. (1992), 6 Cal. Rptr.2d 467, 485, 826 P.2d 710, 728 (internal citations omitted). Thus, under Montana law, implied contractual provisions will not be applied where, as here, express provisions govern. We therefore conclude that the District Court did not err in granting Farmers' motion for summary judgment on the basis Farmers did not breach the covenant of good faith and fair dealing.

### *Waiver of "At Will" Termination Clause*

¶32 Tvedt's next breach of contract claim asserts that Farmers' conduct waived any "at will" provisions in the Agreements. Specifically, Tvedt argues that, despite the "at will" termination language in the appointment agreements and a reference to the "at will" termination in the *Standards*, Farmers' express declarations and conduct reasonably induced a belief that it was waiving its discretion to terminate at will. In support of his argument, Tvedt cites the following language from the *Standards*:

13

> [I]ndividual District Managers must have a clear understanding of what is expected of them . . . . To determine whether the District Manager's contract is to be maintained or not, current year's . . . results will be evaluated using the following General Component Criteria . . . [and] These are the standards which all District Managers are expected to meet as a condition of continuing their District Managers' Appointment Agreement.

Tvedt also states that language contained in correspondence from Bruce Gordon, Division Marketing Manager, also induced the belief that Farmers had waived its discretion to terminate "at will":

> In 2001, you must achieve your net gain requirement of 19 full time agents by yearend. Failure to achieve this performance standard may result in the termination of your District Manager Appointment Agreement.

¶33    "[W]aiver is a voluntary and intentional relinquishment of a known right, claim or privilege which may be proved by express declarations or by a course of acts and conduct so as to induce the belief that the intention and purpose was to waive." *Idaho Asphalt Supply v. DOT,* 1999 MT 291, ¶ 19, 297 Mont. 66, ¶ 19, 991 P.2d 434, ¶ 19 (citing *Kelly v. Lovejoy* (1977), 172 Mont. 516, 520, 565 P.2d 321, 324). Waiver must be "manifested in some unequivocal manner." *Idaho Asphalt Supply,* ¶ 23. "Whether there has been such acquiescence as to defeat the enforcement of a valid restriction depends upon the circumstances of each case and the character and materiality of the permitted breach." *Idaho Asphalt Supply,* ¶ 23 (citing *Kelly*, 172 Mont. at 520, 565 P.2d at 324).

¶34    The District Court found that, while the *Standards* stated they would be used "to determine whether the District Manager's contract is to be maintained or not" and correspondence from Farmers to Tvedt urged him to meet them, the *Standards* also contained

14

a clause stating: "This program in no way modifies the Companies' right to terminate on 30-days notice, with or without cause, anytime during the measurement cycle."

¶35    Thus, in moving for summary judgment, Farmers established that it had reaffirmed its right to exercise the "at will" termination provision by reiterating the provision in the *Standards*. At that point, the burden shifted to Tvedt to demonstrate that Farmers unequivocally, intentionally, and voluntarily relinquished the right to enforce the "at will" provisions in the Agreements. However, Tvedt did not rebut Farmers' evidence, and thus failed to meet his burden. Farmers' effort to underscore its right, rather than relinquish it, is "antithetical to a waiver." *Idaho Asphalt Supply,* ¶ 28. Thus, summary judgment in favor of Farmers on the issue of waiver is appropriate as a matter of law.

**Issue 2**

¶36    ***Did the District Court err in granting summary judgment to Farmers on Tvedt's wrongful termination claim?***

¶37    Tvedt asserts the District Court erred in granting summary judgment against his wrongful discharge claim because genuine issues of material fact exist regarding his employment status and his right to seek damages pursuant to the WDEA. The Manager's Agreement contained the following clause indicating Farmers' intention that district managers hold "independent contractor" status:

> The time to be expended by the District Manager is solely within his/her discretion, and the persons to be solicited and the area within the district involved wherein solicitation shall be conducted is at the election of the District Manager. No control is to be exercised by the Companies over the time when, the place where, or the manner in which the District Manager shall operate in carrying out the objectives of this Agreement . . . .

15

The Corporate Agreement contained essentially the same clause, the only difference being substitution of the words "District Manager Agency" for "District Manager." The existence of this "independent contractor" clause notwithstanding, Tvedt asserts that at the time of his termination he was nonetheless an "employee"[1] of Farmers, thus entitling him to seek relief for wrongful termination under the WDEA.

¶38 Tvedt offers two arguments in support of his assertion that he qualifies as an "employee": (1) he did not meet the statutory criteria for an "independent contractor," and (2) he was governed by, and Farmers recognized, both the Manager's Agreement and the Corporate Agreement at the time of his termination.

¶39 Tvedt bases his first argument on § 39-51-201(15), MCA, which sets forth the statutory definition of "independent contractor":

**39-51-201. General definitions.**
. . .
(15) "Independent contractor" means an individual who renders service in the course of an occupation and:
(a) has been and will continue to be *free from control or direction over the performance of the services*, both under a contract and in fact; and
(b) is *engaged in an independently established trade, occupation, profession, or business*.

(Emphasis added.) Tvedt asserts that from 1986 to 2001, the time period during which he served as District Manager, he was neither "free from control and direction over the performance of [his] services" either under the contracts, or in fact, nor was he "engaged in an independently established . . . business." Instead, he asserts he continued the activities

---

[1]An "employee" is "a person who works for another for hire [excluding independent contractors]." Section 39-2-903(3), MCA.

and business of his predecessor district manager and was compelled to follow the mandates of the company. Tvedt argues he meets neither part (a) nor part (b) of the statutory requirements, thus precluding designation as an "independent contractor," despite the inclusion of the "independent contractor" clause in the Agreements. A review of the record reveals that the District Court did not make specific findings addressing the question as to whether Tvedt properly fell under the definition of "employee" or "independent contractor."

¶40 Tvedt bases his second argument, i.e. that the Manager's Agreement was still in effect concurrently with the Corporate Agreement at the time of his termination, on evidence presented to the District Court indicating that Farmers was still dealing with him as an individual under the Manager's Agreement. Tvedt presented evidence that the Manager's Agreement appointed him individually as "District Manager," and the subsequent Corporate Agreement, while appointing Tvedt's corporation as "District Manager Agency," still specifically appointed Tvedt as "Supervising District Manager." Additionally, the record substantiates that Tvedt presented evidence that Farmers was still interacting with him individually, in addition to his corporation, in the form of correspondence, notices of termination, and checks from Farmers addressed specifically to "L. Lee Tvedt," "L. LeRoy Tvedt," or "Lee Tvedt." These documents, according to Tvedt, constitute evidence sufficient to raise the inference for summary judgment purposes that he, not L. L. Tvedt Insurance, Inc., was Farmers' "employee." We agree.

¶41 Further, Tvedt asserts his individual capacity with Farmers continued after the formation of the Corporate Agreement because the Manager's Agreement was never formally

17

terminated. He first notes that the Corporate Agreement contains no language specifically terminating the Manager's Agreement. Second, the Manager's Agreement, although it contains a provision specifying termination events, does not reference formation of the Corporate Agreement. Third, although the procedure specified in the Manager's Agreement provides for notice of termination of that agreement, no notice was given at the time of the formation of the Corporate Agreement that the prior agreement was being terminated or superseded.

¶42 Farmers simply responds that "[t]he new Agreement is presumed to be the only Agreement" on the basis of novation. Section 28-1-1502, MCA, defines three ways in which a novation can occur:

> **28-1-1502. Kinds of Novation.** Novation is made by the substitution of:
> (1) a new obligation between the same parties with intent to extinguish the old obligation;
> (2) a new debtor in place of the old one with intent to release the latter; or
> (3) a new creditor in place of the old one with intent to transfer the rights of the latter to the former.

Farmers states that Tvedt and Farmers, at the time L. L. Tvedt Insurance, Inc., and Farmers signed the Corporate Agreement, entered into a new contract through operation of novation. In support of its argument, Farmers cites *Kenison v. Anderson* (1928), 83 Mont. 430, 272 P.2d 679, in which one debtor in a land purchase transaction was substituted for another, with the former being released. However, as Tvedt correctly notes, *Kenison* represents a novation under subpart (2) of the statute, involving a "new debtor in place of the old one with intent to release the latter." Tvedt states that the facts in the case *sub judice* do not involve a debtor,

18

as in *Kenison,* but rather fall under subpart (1) which requires substitution of "a new obligation between *the same parties* with intent to extinguish the old obligation." (Emphasis added.) According to Tvedt, the two Agreements were not between the same parties since the Manager's Agreement was between Tvedt and Farmers, and the Corporate Agreement was between L. L. Tvedt Insurance, Inc., and Farmers.

¶43 This Court has stated that novation can never be presumed:

> In order to effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for *it is a well-settled principle that novation is never to be presumed . . .*; the point in every case, then, is, did the parties intend by their arrangement to extinguish the old debt or obligation and rely entirely on the new, or did they intend to keep the old alive and merely accept the new as further security, and this question of intention must be decided from all of the circumstances.

*Waite v. Andreassi* (1991), 249 Mont. 149, 149, 813 P.2d 987, 988 (emphasis added) (citing *Harrison v. Fregger* (1930)*,* 88 Mont. 448, 454, 294 P. 372, 373). Thus, Farmers' assertion that a novation may be presumed from this record must be rejected. As noted above, because Tvedt has presented evidence indicating that at certain times Farmers interacted with Tvedt as an individual and other times as a corporation, this comprises facts in conflict which must be resolved at trial. Upon remand, both Farmers and Tvedt would have the opportunity to offer evidence of the presence or absence of novation.

¶44 Despite these and other indicia that Farmers recognized the continuation of Tvedt's individual capacity following the appointment of his corporation as a district manager agency, the District Court concluded only that the two agreements revealed a "clear intention" by the parties to substitute the corporation for the plaintiff personally. The court's rationale in

support of this conclusion was: (1) the only way Tvedt could be compensated under the Corporate Agreement, aside from medical insurance, was to be paid by L. L. Tvedt Insurance, Inc., and (2) in their second amended complaint, Tvedt and his corporation chose to refer to themselves collectively as "Tvedt," therefore, "Plaintiff see themselves as one entity." However, we conclude that, despite these observations, unresolved genuine issues of material fact existed on the questions of whether Tvedt was an "employee" or an "independent contractor," and whether the Manager's Agreement, which recognized Tvedt individually, was still in effect at the time of termination, thus precluding summary judgment.

¶45 Because it concluded that summary judgment was appropriate based upon Farmers' novation theory, the District Court concluded that Tvedt was not an employee, and, consequently, did not consider the issue of whether Tvedt was otherwise entitled, as a matter of law, to seek relief under the WDEA. Further, the parties' briefing on appeal did not focus on this issue. Therefore, we decline to address the issue, which may be considered upon remand.

**Issue 3**

¶46 *Did the District Court err in dismissing Tvedt's claims for business expense indemnification?*

¶47 Finally, Tvedt asserts the District Court erred in dismissing his claims for reimbursement of business expenses which he lost, together with prejudgment interest, as a direct consequence of his duties to comply with Farmers' directives. The District Court summarily dismissed this claim noting: "The [district court] has already found that the parties

were operating as two contracting businesses, thus, there was no employer-employee relationship."

¶48 Tvedt's argument that his right to recover is not limited to Tvedt's individual employment status on the basis of § 39-2-101, MCA, is without merit. This section provides "[t]he contract of employment is a contract by which one, who is called the employer, engages another, who is called the employee, to do something for the benefit of the employer . . . ." Although Tvedt attempts to define the word *another* as "a corporation," we find neither legal precedent nor legislative intent for doing so. We agree with the District Court that "[i]t is simply axiomatic that one corporation cannot be an employee of another." Consequently, this issue is contingent upon the District Court's finding, upon remand, regarding Tvedt's employment status. If Tvedt would be found to be an "employee," this would also revive his claim for reimbursement of business expenses paid by an "employee."

¶49 We reverse and remand for further proceedings on Issue 2 and Issue 3.


/S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ JIM REGNIER


21

Justice W. William Leaphart dissenting.

¶50    I dissent to Issue 1. Farmers clearly waived the benefit of the "at will" provisions in the Agreements when it adopted and distributed the following Standards:

> [I]ndividual District Managers must have a clear understanding of what is expected of them. . . . To determine whether the District Manager's contract is to be maintained or not, current year's . . . results will be evaluated using the following General Component Criteria . . . [and] These are the standards which all District Managers are expected to meet as a condition of continuing their District Managers' Appointment Agreement.

¶51    The Standards are clear:  A district manager's contract renewal is not "at will"– i.e., not subject to the whim of the employer–but rather is measured by adherence to the General Component Criteria.  If there was any doubt as to the import of this language, Farmers' Division Marketing Manager, Bruce Gordon, clarified that tenure as a manager with Farmers hinged not upon the caprice of the employer but rather on "achievement" and "performance," when he wrote:  "[Y]ou must achieve your net gain requirement of 19 full time agents by yearend.  Failure to achieve this performance standard may result in the termination of your District Manager Appointment Agreement."  The Court finds significance in the fact that Farmers' Standards covered all the bases and preserved its "at will" option by stating:  "This program in no way modifies the Companies' right to terminate on 30-days notice, with or without cause, anytime during the measurement cycle."  I do not buy into this Orwellian double speak.  If Farmers maintained that it had "at will" discretion to terminate a manager, there would be no need for Farmers to set standards stating that if the manager does not meet certain performance standards, he or she may be terminated.   Under the Court's interpretation, the Standards are nothing more than surplusage.  In effect Farmers has stated, "if you do not meet the performance standards you may be terminated and if you do meet the standards you may still be terminated."  I disagree.  Standards are the antithesis of "at will" discretion.  Farmers cannot have it both ways.  In adopting the Standards,  Farmers clearly promised its managers that if they meet certain standards their contracts will continue. This

22

constitutes a voluntary and intentional relinquishment of a known right to terminate "at will." *Idaho Asphalt Supply v. DOT*, 1999 MT 291, 297 Mont. 66, 991 P.2d 434.

/S/ W. WILLIAM LEAPHART