

DA 11-0500

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 154

SHAUNE KUSZMAUL,

        Plaintiff and Appellant,

   v.

STERLING LIFE INSURANCE COMPANY,

        Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV-2010-62
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

           Steven T. Potts, Attorney at Law, Great Falls, Montana

        For Appellee:

           Robert T. Cameron, Gough, Shanahan, Johnson & Waterman, PLLP,
           Helena, Montana

           Robert H. Bernstein, Phillip J. Lipari, Constangy, Brooks & Smith, LLP,
           Princeton, New Jersey

Submitted on Briefs:  May 16, 2012

Decided:  July 20, 2012

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Shaune Kuszmaul (Kuszmaul) appeals from the Decision and Order (Order) entered by the First Judicial District Court of Lewis and Clark County, Montana, granting summary judgment to Sterling Life Insurance Company (Sterling) on her wrongful discharge claim, and denying partial summary judgment to Kuszmaul.

¶2 We affirm.

## ISSUES

¶3 Kuszmaul raises two issues on appeal. We restate the issues as follows:

¶4 1. Did the District Court err in granting Sterling Life Insurance Company's Motion for Summary Judgment based on its determination that Kuszmaul was not wrongfully discharged from her employment?

¶5 2. Did the District Court err in denying Kuszmaul's Motion for Partial Summary Judgment pertaining to Sterling's affirmative defenses?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Beginning in May 2000, Kuszmaul was employed as an Outside Sales Agent by Olympic Health Management Systems, Inc. (Olympic),[1] a subsidiary of Aon Corporation, and a sister company of Sterling since 1999. Sterling is a national insurance provider which sells various insurance plans, including health and life insturance. Kuszmaul signed an employment agreement with Olympic on May 19, 2000, which included the following provision: "You agree not to use any advertising materials, supplies, other

---

[1] This corporation is referred to as Olympic Health Management Systems, Inc. and Olympic Health Management Services, Inc. throughout the record and briefing. We refer to it as Olympic throughout this Opinion.

printed or written material used in the sale or promotion of the Carrier's policies without prior written approval of Olympic." The agreement also provided that "[n]otwithstanding anything stated herein to the contrary, employment at Olympic is voluntarily entered into and may be terminated by either party, with or without cause, at any time."

¶7 On November 6, 2002, Kuszmaul signed another employment agreement with Olympic, which noted that "Olympic is engaged in the business of the sale of life and health insurance and coverage products for Sterling Life Insurance Company," that Sterling owns the business named in the agreement, and that under the agreement, Kuszmaul will be "acting as a Sales Agent of Olympic and Sterling." (Internal parenthetical definitions excluded.) This agreement contained similar provisions as the one signed in 2000, including:

3.3.2 Advertising and Sales Promotion Material
a. Agent agrees not to use any advertising medium, leads, supplies, or other printed or written materials used in the sale or promotion of Sterling's policies without prior authorization.
b. In the event Agent becomes aware of any materials used in the sale or promotion of the carrier's policies which have not been authorized by Olympic, Agent agrees to promptly disclose such information to Olympic.

7.1 Employment At Will
As stated in Section 1 of this Agreement, employment with Olympic is "at-will". Either party may terminate this Agreement at any time, with or without cause and with or without prior notice.

8.6 No Waiver. No act of forbearance or toleration on the part of either party to this Agreement in favor of the other with respect to any provision of this Agreement, either express or implied, shall be construed as a waiver by either party of any of its rights hereunder.

3

¶8     Kuszmaul signed yet another employment agreement on January 1, 2008, which contained provisions identical to those in the 2002 contract.  Sterling had a written Zero Tolerance Policy (Policy), requiring all solicitation materials for Sterling to be pre-approved by its home office, and providing that without exception, a violation of the Policy would result in immediate termination.  It is undisputed that Kuszmaul was aware of the Policy.  The employment agreement she signed included the following provision:

> 4.  Zero Tolerance Activities
>     Agents, Field Sales Managers and Market Managers selling Sterling products will be immediately terminated, without exception, for:
>
> 4.2   Use of Unapproved Marketing Materials/Leads – Distributing in any fashion (including but not limited to mailing, handing out in person or placing as advertisement for publication or broadcast) any document that describes Sterling or a Sterling product and has not been explicitly approved for use by the home office.
>       It is to be noted that this is a violation of State and Federal law and regulation, and is also a direct breach of the OHM Sales Agent Employment Agreement.

According to Kuszmaul, she signed and dated this document after she carefully read it, she agreed with the content of it before signing it, and she understood she was required to comply with it.

¶9     On April 1, 2008, Sterling was sold to Munich-American Holding Company, though Aon Corporation still managed several employee programs for six more months. On this same date, Sterling adopted an Employee Handbook (Handbook), which was designed to help the employees get acquainted with the "organization's general policies and practices applicable to all employees."

4

¶10 On September 21, 2009, Kuszmaul read and signed a separate document specifying Sterling's Policy. This document included the same Zero Tolerance Activities provision as noted above, though "immediately terminated" was underlined. The document also stated at the beginning that "[the Centers for Medicare and Medicaid Services (CMS)] and the state departments of insurance are heavily scrutinizing the marketing activities of companies selling in the Medicare market place," and that Sterling thought it "prudent to publish a list of activities that will not be tolerated." In signing the document, Kuszmaul agreed to the following:

> I have read and understand the Sterling Zero Tolerance Policy. I understand that I must comply with all provisions in this document and that failure to comply with the above listed policy will result in termination of employment.

¶11 In October 2009, Kuszmaul drafted a marketing letter promoting Sterling products. She mailed out approximately 1,000 copies of the letter to current and potential customers. Notably, Kuszmaul did not obtain approval from anyone at Sterling before sending the letter, nor did she clear it with the Montana Department of Insurance (DOI) or any other regulatory agency. A relative of one of the recipients of the letter anonymously notified Sterling by mail that the letter might violate the Policy. The writer sent a copy of its complaint, dated November 20, 2009, to the Sterling Life Corporate Compliance Office, the Montana DOI, and the CMS Regional Office, exposing Sterling to possible state and federal sanctions. This prompted Sterling to begin an internal investigation.

5

¶12    While being investigated, Kuszmaul acknowledged that her marketing letter was not in conformance with the Policy, but denied doing anything *intentionally* wrong. On November 24, 2009, Marty Sawicki, one of Kuszmaul's managers at Sterling, contacted Kuszmaul by telephone, explained the marketing letter could be grounds for termination, and asked her to write a letter explaining why she sent the marketing letter. Kuszmaul issued a written apology to Sterling on November 25, 2009, acknowledging how her mailing may have appeared from Sterling's perspective, and pointing out that she had worked for Sterling for ten years.

¶13    While the investigation was ongoing and before deciding what discipline was appropriate for Kuszmaul's misconduct, Sterling sent to multiple employees, including Kuszmaul, a document to sign titled "Sales Employment Agreement" (Agreement). The Agreement included provisions of the Policy and specified that employment with Sterling was at will. It included provisions identical to the 2002 "Advertising and Sales Promotion Material" and "No Waiver" sections, with the only change being the replacement of "Olympic" with "Sterling." It also had a section about the Policy, which stated: "Agent agrees to abide by Sterling's Zero Tolerance Policy. A copy of the current policy is attached hereto and amended at anytime by publication by Sterling."

¶14    Kuszmaul signed the Agreement on December 3, 2009. Sometime after she did so, Sterling's Agent Review Board recommended termination of Kuszmaul's employment for her violation of the Policy. She was subsequently terminated on December 18, 2009, for violating Sterling's Policy by "[sending] out marketing materials (letters) to customers without DOI or CMS or Company approval."

¶15 On January 22, 2010, Kuszmaul filed a complaint under Montana's Wrongful Discharge from Employment Act (WDEA), §§ 39-2-901 to -915, MCA (2009). Kuszmaul claimed that Sterling violated the WDEA because her discharge was not for good cause, she had completed Sterling's probationary period of employment, and that Sterling violated the express provisions of its own written personnel policies. Sterling moved to dismiss the complaint, stating that it "relied on reasonable job-related grounds and other legitimate business reasons for terminating [Kuszmaul's] employment." Sterling then moved for summary judgment and Kuszmaul moved for partial summary judgment on the affirmative defenses asserted by Sterling.

¶16 The District Court held a hearing on the cross-motions for summary judgment on June 2, 2011, at which both parties were represented by counsel. On July 26, 2011, the District Court issued its Order granting summary judgment for Sterling and denying Kuszmaul's motion for partial summary judgment.

¶17 Kuszmaul appeals.

## STANDARD OF REVIEW

¶18 "We review a district court's grant or denial of a motion for summary judgment de novo and apply the same criteria under M. R. Civ. P. 56 as applied by the district court." *Williams v. Plum Creek Timber Co.*, 2011 MT 271, ¶ 13, 362 Mont. 368, 264 P.3d 1090. Summary judgment should only be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3). Once the party moving for summary judgment has demonstrated

7

that no genuine issues of material fact exist and it is entitled to judgment as a matter of law, "the burden then shifts to the non-moving party to prove by more than mere denial and speculation that a genuine issue of material fact does exist." *Williams*, ¶ 14; *Arnold v. Yellowstone Mt. Club, LLC*, 2004 MT 284, ¶ 14, 323 Mont. 295, 100 P.3d 137. A "material fact" is one that "involves the elements of the cause of action or defenses at issue to an extent that necessitates resolution of the issue by a trier of fact." *Williams*, ¶ 14 (quoting *Arnold*, ¶ 15).

## DISCUSSION

¶19 *Issue One: Did the District Court err in granting Sterling Life Insurance Company's Motion for Summary Judgment based on its determination that Kuszmaul was not wrongfully discharged from her employment?*

¶20 Kuszmaul argues on appeal that the District Court erred in granting Sterling's motion for summary judgment. She argues there was not good cause for her termination, and further that Sterling waived its right to terminate her employment by presenting her with the Agreement in December 2009. She also alleges that Sterling violated its own personnel policies in the handling of her discharge. Finally, Kuszmaul argues that the District Court erred when it failed to grant her motion for partial summary judgment due to the lack of sufficient evidence provided by Sterling to support the affirmative defenses it asserted.

¶21 Sterling argues that it had good cause to terminate Kuszmaul, that it did not waive its right to termination, and that the termination did not violate its personnel policy. Sterling asserts that the Agreement was merely "a routine modification to her commission schedule," and not a new employment agreement.

8

¶22 With few exceptions, the WDEA is the exclusive remedy for a wrongful discharge from employment in Montana. Section 39-2-902, MCA (2009); *Williams*, ¶ 18. Under the WDEA:

> (1) A discharge is wrongful only if:
> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
> (b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
> (c) the employer violated the express provisions of its own written personnel policy.
> (2)(a) During a probationary period of employment, the employment may be terminated at the will of either the employer or the employee on notice to the other for any reason or for no reason.
> (b) If an employer does not establish a specific probationary period or provide that there is no probationary period prior to or at the time of hire, there is a probationary period of 6 months from the date of hire.

Section 39-2-904, MCA (2009).

¶23 Applying § 39-2-904(1)(b), MCA, we first address the issue of "good cause." " 'Good cause' means reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Section 39-2-903(5), MCA (2009). Kuszmaul admitted that she had read, signed, and understood the Policy, and that she sent out her unapproved letter in November 2009. It is also undisputed that the Policy clearly provides that a violation would result in immediate termination, and that Sterling terminated Kuszmaul in December 2009 for her violation of the Policy. Given the foregoing facts, there is simply no question that Kuszmaul committed a serious Policy infraction, and that Sterling had the right to terminate her for doing so. "Good cause" existed for the

9

discharge. This being so, it is unnecessary to consider whether Kuszmaul had completed her probationary period of employment.[2]

¶24 Alternatively, Kuszmaul argues that while good cause for termination may have existed upon her mailing of the letter, Sterling "waived" its good cause to discharge her when it later provided her with the December 3, 2009 Agreement. We reject this argument. The new agreement was sent to all employees as a matter of course and in any event, it too contained the at-will provisions and the zero tolerance policy upon which Sterling relies for the discharge. Waiver must be manifested unequivocally. *Tvedt v. Farmers Ins. Group of Cos.*, 2004 MT 125, ¶ 33, 321 Mont. 263, 91 P.3d 1. By simply sending Kuszmaul and multiple others a routine document, Sterling did not unequivocally manifest "an intentional or voluntary relinquishment" of its right to terminate Kuszmaul's employment for violation of the Policy. *Sperry v. Mont. State Univ.*, 239 Mont. 25, 30, 778 P.2d 895, 898 (1989).

¶25 Next, we address Kuszmaul's argument that Sterling violated the express provisions of its own written personnel policy set forth in its 2008 Handbook, thus rendering her discharge wrongful under § 39-2-904(1)(c), MCA. She argues that under the Policy, an employee would be immediately terminated for distributing documents describing Sterling or a Sterling product which "ha[ve] not been explicitly approved for use by the home office," while the Handbook states that "[d]epending on the seriousness and circumstances of each individual case, misconduct can result in various degrees of

---

[2] In addition, because we conclude there was good cause for Kuszmaul's discharge, we do not express an opinion on the lawfulness of the "at-will" provision contained in the employment agreement.

discipline, ranging from warnings to unpaid suspensions to termination of employment." Kuszmaul cites an email exchange between Sterling managers for the proposition that they chose to follow the Policy and terminate her rather than follow the Handbook and discipline her according to "management discretion on an individual basis."

¶26 We reject this argument. The Handbook clearly contemplates that a termination of employment may be appropriate depending on the seriousness of the situation. It does not require progressive discipline in every case. The discharge of an employee for a significant infraction is within the purview of the Handbook; therefore, Sterling did not violate the express provisions of its personnel policy by terminating Kuszmaul's employment for violation of the Policy. Kuszmaul further posits that the personnel policy was contravened due to the manner in which the Termination Request form was completed, but she fails to cite with particularity any policy provision that was violated. We find this allegation speculative and unsupported by evidence. "The party opposing summary judgment cannot rely on mere allegations in the pleadings, but must present its evidence raising genuine issues of material fact in the form of affidavits or other sworn testimony." *Yarbro, Ltd. v. Missoula Fed. Credit Union*, 2002 MT 152, ¶ 10, 310 Mont. 346, 50 P.3d 158.

¶27 *Issue Two: Did the District Court err in denying Kuszmaul's Motion for Partial Summary Judgment pertaining to Sterling's affirmative defenses?*

¶28 Because we affirm the entry of summary judgment in favor of Sterling, we need not reach this issue.

**CONCLUSION**

11

¶29 All of the salient facts surrounding Kuszmaul's termination are undisputed. For the foregoing reasons, we therefore affirm the entry of summary judgment in favor of Sterling.

/S/ PATRICIA COTTER

We concur:

/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ JIM RICE