NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

|  |  |
|---|---|
| In re:<br>DUANE E. ANDERSON and JEANNE C.<br>ANDERSON,<br>    Debtors. | BAP No. MT-22-1238-LBC<br><br>Bk. No. 1:21-bk-10115-BP<br><br>Adv. No. 1:21-ap-01005-BP |
| DUANE E. ANDERSON; JEANNE C.<br>ANDERSON,<br>    Appellants,<br>v.<br>STATE OF MONTANA; MONTANA<br>DEPARTMENT OF NATURAL<br>RESOURCES AND CONSERVATION,<br>    Appellees. | **MEMORANDUM**<sup>*</sup> |

Appeal from the United States Bankruptcy Court
for the District of Montana
Benjamin P. Hursh, Bankruptcy Judge, Presiding

Before: LAFFERTY, BRAND, and CORBIT, Bankruptcy Judges.

## INTRODUCTION

Debtors Duane and Jeanne Anderson appeal the bankruptcy court's

entry of judgment against them in their adversary proceeding against the

---

    * This disposition is not appropriate for publication. Although it may be cited for
whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential
value, *see* 9th Cir. BAP Rule 8024-1.

1

state of Montana and its Department of Natural Resources and Conservation (jointly referred to as the "DNRC"). The bankruptcy court considered the Andersons' and the DNRC's cross-motions for summary judgment, and the DNRC's subsequent follow-up motion for summary judgment, and ruled that because the Andersons failed to pay the rent timely on four Montana state land leases (entitled Agricultural & Grazing Lease of State Lands (the "Leases")), the DNRC properly terminated the Leases prepetition. The bankruptcy court also rejected the Andersons' claims that, notwithstanding their failure to pay the rent timely, the DNRC breached the contractual covenant of good faith and fair dealing. Because we discern no error, we AFFIRM.[1]

## FACTS[2]

### A.    Prepetition events

Duane and Jeanne Anderson, Debtors and Plaintiffs in this adversary proceeding, were parties to the Leases which Mr. Anderson's grandfather had obtained decades earlier and which were subsequently transferred to the Andersons. The combined four leases included 3,104 acres, or roughly

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case and adversary proceeding. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

1400 acres of grazing land and 1700 acres of agricultural land.[3] Each Lease form indicated the amount of land covered by the Lease and how much of that was for grazing purposes. The DNRC managed the Leases for the state pursuant to Montana Code Ann. § 77-1-301.[4]

Beginning in 1997, the Andersons obtained various loans from the United States Department of Agriculture ("USDA") and as part of the loans, pledged the Leases as security for the obligations. The loan documentation included executed assignments of the Leases which, according to the parties, were held in escrow to facilitate a USDA foreclosure on the Leases if necessary.[5] Rocky Mountain Bank, the Andersons' bank, also held a lien on the leasehold interests.

Each of the Leases stated:

---

[3] The Andersons were parties to a fifth lease which the parties call the "Cabin Lease." The Cabin Lease is not at issue here. The rent on that lease was due on June 10 which explains some of the confusion about when "the rent" was due as discussed below beginning at page 6. The Cabin Lease was assumed by the Andersons during the chapter 12 case.

[4] Mont. Code Ann. Chapter 1, Part 3, entitled Department of Natural Resources and Conservation, section 77-1-301 states:

(1) Under the direction of the board, the department has charge of the selecting, exchange, classification, appraisal, leasing, management, sale, or other disposition of the state lands. It shall perform such other duties the board directs, the purpose of the department demands, or the statutes require.

(2) It shall collect and receive all moneys payable to the state through its office as fees, rentals, royalties, interest, penalties, or payments on mortgages or lands purchased from the state or derived from any other source. It shall issue a receipt for each cash payment or whenever requested by the payer.

[5] Both parties agree the assignments were being held in escrow.

1.     ALL GRAZING RENTALS ARE DUE BY MARCH 1 EACH YEAR AND FAILURE TO PAY BY APRIL 1 AUTOMATICALLY CANCELS THE ENTIRE LEASE. . .

This was consistent with Montana law which provides in relevant part, "[i]f the full rental and the $25 penalty are not paid by April 1, the entire lease is canceled."[6] Mont. Code Ann. § 77-6-506(1).

On March 17, 2020, the DNRC sent a certified letter, addressed to Duane E. Anderson at a post office box address in Scobey, Montana, notifying him that rent due for "the grazing portion of the lease" was late and warning him that the Leases would be cancelled unless the payment was received by April 1, 2020 (the "Late Rent Notice Letter"). Jeanne Anderson accepted the letter and signed the mail certification form without noting the date received.

On March 26, 2020, the Governor of Montana, Steve Bullock, issued to "Montanans; all officers and agencies of the State of Montana," a "Directive Implementing Executive Orders 2-2020 and 3-2020 providing measures to stay at home and designating certain essential functions" (the "Stay-at-Home Order"). The Stay-at-Home Order noted at the outset that a "state of emergency exists in Montana due to the global outbreak of COVID-19 Novel Coronavirus." It mandated that "individuals may leave their home or residence only to perform [certain] Essential Activities. . ." It

---

[6] The Leases also state that "agricultural rentals" are due on November 15 and if not paid by December 31, "the entire lease is canceled."

decreed further that "[a]ll businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations . . ." One Essential Business exception was "businesses . . . that provide . . . products or services critical to food and livestock production." The order "categorically exempted" "state government employees."

On March 30, 2020, the Andersons mailed a check to the DNRC, signed by Duane Anderson, for $6,771.20, the amount demanded in the Late Rent Notice Letter. The DNRC acknowledged receiving the check on April 2, 2020. However, as there was only $63.90 in the account at the time, Rocky Mountain Bank returned it for insufficient funds.

The DNRC subsequently notified the Andersons by certified letter dated April 21, 2020 that the Leases were cancelled based on the failure to pay the rent but gave them until May 8, 2020 to reinstate the Leases by paying the past due rent plus a penalty of "one times the rental rate" for a total of $13,342.40 (the "Reinstatement Letter"). The Reinstatement Letter noted that Mont. Code Ann. § 77-6-506(1) gave authority to the DNRC to reinstate the Leases "upon payment of the rental, plus a penalty per lease of up to three times the annual rental." The Andersons assert that they did not receive the Reinstatement Letter until the May 8 deadline had passed. But they concede that they did not make that payment.

The Andersons were thereafter notified by letter dated June 9, 2020 that the Leases were cancelled as of April 1, 2020 (the "Cancellation Notice Letter").

From the Late Rent Notice Letter on March 17, 2020 to mid-June 2020, confusion abounded according to the Andersons, which resulted in the rent payment not being made. For example, as the Andersons relate,[7]

- During this period, Mr. Anderson was convalescing from chemotherapy treatments for cancer. One day after issuance of the Stay-at-Home Order, he moved from his family home in Scobey, Montana to the farmhouse on the Cabin Lease property.

- The Andersons expected Rocky Mountain Bank to clear the check, even though their account had insufficient funds, because it had done so in the past on a number of occasions. This is confirmed by an Affidavit of bank Vice President Tyler Young. Mr. Young stated that he was at home and not at the bank when the check was presented. He would have permitted the check to clear had he been there.

---

[7] The facts below come from an Affidavit Mr. Anderson filed with his complaint in state court, and from emails included in a package of exhibits filed with a pleading entitled Plaintiff's Exhibit and Witness List for Hearing Scheduled for January 4, 2022. The exhibits were not supported by any declarations.

- The Reinstatement Letter was sent to the USDA office in Scobey Montana. But that office was closed due to the Stay-at-Home Order.

- The Reinstatement Letter was not actually reviewed by the Andersons, or Rocky Mountain Bank until the May 8 deadline had passed.

- On May 7, 2020, Britney Cornwell from a USDA affiliate sent an email to DNRC employee Heather Noel inquiring about whether the Leases were current. Ms. Noel responded that they were not and included a copy of the Reinstatement Letter. Ms. Noel further erroneously advised Ms. Cornwall that the Andersons had until June 10th to "submit full payment" apparently confusing the deadline for paying rent due on the Cabin Lease with the deadline for the rent due on the grazing Leases.

- On May 26, 2020, Ms. Cornwell inquired again by email of Ms. Noel about the status of the rent and advised that the USDA would be paying the past due rent before June 10, 2020. Ms. Noel responded on June 1, 2020 that the payment was received that day again confusing the Cabin Lease and the grazing Leases.

- On May 28, 2020, Ms. Cornwell requested an update by email to DNRC employee Matthew Poole, commenting that the

7

USDA would have paid the rent for the Leases had they received the notice re reinstatement. She noted that Ms. Noel whom she had previously communicated with was apparently not the right person to deal with on the Lease administration.

- On June 2, 2020, Tyler Young at Rocky Mountain Bank contacted Amanda Taylor at the DNRC by email about the status, asking "[i]s there anything the bank can do to make sure [the Leases] get paid and not terminated?" Ms. Taylor responded that the person to speak to was Kelly Motichka, the DNRC Bureau Chief. Mr. Young sent two more emails to Ms. Motichka on June 5 and June 11 but apparently received no response.

- Mr. Anderson claimed that he first became aware that his check bounced and the DNRC had offered reinstatement terms on June 4, 2020. That is the day he drove from the farmhouse to Scobey and picked up the mail.

- On June 9, 2020, Ms. Motichka sent the Andersons the Cancellation Letter notifying them that the Leases were cancelled as of April 1, 2020.

## B.    The state court litigation

On March 18, 2021, the Andersons filed a complaint in the Montana First Judicial District Court asserting four causes of action: breach of contract, tortious breach of the implied covenant of good faith and fair

dealing, injunctive relief, and declaratory relief. The DNRC responded with a motion to dismiss the tort action on the basis that the Andersons could not assert a tort against the state without first following a claims process based on the Montana Tort Claims Act. Ultimately, the Andersons did not oppose the motion and consented to entry of an order dismissing that cause of action. However, the complaint was not amended thereafter.

## C. Removal of the state court litigation to the bankruptcy court and the first motions for summary judgment

On October 26, 2021, the Andersons filed their chapter 12 petition.[8] They then removed the state court litigation to the bankruptcy court.

### 1. The Andersons' motion for partial summary judgment

On January 14, 2022, the Andersons filed a motion for partial summary judgment seeking a ruling from the bankruptcy court that the DNRC breached the Leases because the "lease payment[s] w[ere] not due under the plain language of their contracts until November 15, 2020."

In their motion, the Andersons argued first, that under subsequent lease "addendums," called Conservation Reserve Program Cash Lease Agreements (the "Cash Lease Agreements"), the Leases were modified to provide that the rent was to be paid on November 15th of each year. They argued that the Cash Lease Agreements' language, "the annual cash rental payment" (which was due on November 15th), included the "grazing rent" payment required under the Leases.

_____

[8] The Andersons' chapter 12 plan was confirmed by the bankruptcy court by

The Andersons further argued that Mont. Code Ann. § 77-6-506(1), modified the Leases making the grazing rent payment due on December 31 of each year. That code section, entitled "Date when rental due--penalty--cancellation for nonpayment" provides in part that "[i]f the United States is the lessee of state lands for grazing purposes, the rental is payable at the end of each year of the lease." The next sentence of the same section states, "[t]he rental . . . , with the exception of a lease that involves the United States as the lessee, is due and payable before March 1." The Andersons argued that based on their assignments of the Leases to the USDA, the United States "stepped into the shoes of the lessees of state land" and became the lessee thereby triggering Mont. Code Ann. § 77-6-506(1). They further argued that the United States was at least "involved . . . as the lessee" and therefore the rent was not due until "the end of the lease year."

The DNRC timely opposed the motion. As to the Cash Lease Agreements, the DNRC argued that those were separate independent agreements whereby the Andersons "enrolled the [Leases] into the USDA Conservation Reserve Program ("CRP") as part of the State Acres for Wildlife Enhancement Pheasant Winter Cover Program" which required the Andersons to pay supplemental rent for acreage that was converted to CRP. That rent was the annual cash rental payment required under the Cash Lease Agreements and had nothing to do with other rental payments required to be paid under the Leases.

order entered on January 31, 2023.

10

As to the assignments of the Leases to the United States, the DNRC argued that the assignments had no legal effect on the Leases. The assignments were solely between the Andersons and the USDA and were being held in escrow in the event that the USDA foreclosed at some point. The DNRC asserted that there had been no foreclosure and that "[t]he assignment forms were not dated, signed or approved by DNRC." Further, the plain language in each of the Leases mandated that any assignment was not effective until it was signed by the Director of the DNRC. Hence there were no assignments; the United States was not a lessee under the Leases.

The Andersons replied by repeating their arguments in their motion. They argued that DNRC regulations do not require that the assignments be approved by it, citing Admin. R. Mont. § 36.25.222, which states that "assignments recorded for loan securitization purposes become effective upon recordation/perfection." An assignment "placed into escrow," must be "filed with the department." *Id.* They argued that even if the assignments failed to make the United States a lessee, they were enough to make the United States "involved as a lessee." The Andersons did not define the term "involved as a lessee."

## 2. The DNRC's cross-motion for summary judgment

The DNRC responded to the Andersons' motion for summary judgment with a short cross-motion for summary judgment asking the bankruptcy court to find that it properly cancelled the Leases, and

repeating their opposition to the Andersons' motion. The Andersons' opposed the DNRC cross-motion largely repeating the facts and arguments in their own summary judgment motion.

### 3. The bankruptcy court ruling on the initial motions

The bankruptcy court did not conduct a hearing on the two motions; it entered its written memorandum on June 1, 2022. As to the Andersons' motion, the bankruptcy court agreed with the DNRC that the documents were not ambiguous and required that the rent be paid no later than April 1. If not so paid, the Leases were cancelled.

The bankruptcy court noted that the plain language in paragraph 1 of the Cash Lease Agreements stated that "the annual cash amount for including State lands in the CRP program, set forth herein, is owed by the Lessee to the State, **in addition to all other payments set forth in the Lease Document**, including but not limited to grazing and crop share payments." Paragraph 2 provided that "the CPR acreage will be cash leased at the rate of $23.60 per CRP acre . . ." The bankruptcy court found that the language in paragraph 9 that "the Lessee understands that the annual cash rental payment will be due and payable on or before November 15th of each year" cannot be construed to modify the plain terms of the Leases as to when the grazing rent was due.

The bankruptcy court further ruled that the United States was not a lessee of the lands because the assignments were not approved by the Director of the DNRC, citing Admin. R. Mont. § 36.25.222. The regulation

states in plain language, "[u]ntil the assignment becomes effective, the Department will consider the lessee listed above to be the lessee for all purposes."

As to the DNRC's cross-motion for summary judgment, the bankruptcy court granted the motion to the extent it requested a finding that the grazing rent was due no later than April 1 based on the unambiguous language in the Leases and related documents. But the court denied the motion as to whether DNRC properly cancelled the Leases.

## D.    The DNRC second motion for summary judgment

In June 2022, the DNRC filed a second motion for summary judgment seeking a ruling in its favor as to the remaining Anderson claims, specifically the breach of contract and declaratory relief claims, and requested a finding that the Leases were in fact appropriately cancelled. The motion focused on two arguments: first, that its decision to cancel the Leases was not arbitrary or capricious because the Leases "were automatically cancelled as a matter of law," under Mont. Code Ann. § 77-6-506(1). Second, that tender of a check with insufficient funds to cover the amount of the check was not payment of the rent citing *United States Nat. Bank of Red Lodge v. Shupak*, 54 Mont. 542, 172 P. 324, 326 (1918) ("Giving a worthless check does not pay a debt").

After filing the second motion, the DNRC moved for an order staying any further discovery until the DNRC's second motion could be heard. The Andersons opposed the motion arguing that they had the right to conduct

13

discovery under Civil Rule 56(d) and that discovery was necessary. They conceded that "[t]he lion's share of the document production has been completed" but asserted that depositions were essential "to presenting the complete record pertinent to Defendants' pending motion for summary judgment." The bankruptcy court issued the requested stay.

The Andersons thereafter opposed the second motion for summary judgment repeating much of their argument from the previous motions, and further arguing that there were material disputed facts "as to whether [DNRC's] failure to make reasonable payment accommodations during the COVID-19 pandemic constitutes a breach of the duty of good faith and fair dealing."[9] They argued that the DNRC's conduct violated the contractual implied covenant of good faith and fair dealing.

The DNRC replied by arguing that a claim for breach of the implied covenant was not pled by the Andersons in their complaint and the arguments should be rejected on that basis.

After oral argument, the bankruptcy court entered its memorandum of decision on November 28, 2022, ruling that the Leases were properly cancelled for non-payment of the rent pursuant to the plain language of the

---

[9] They also argued that a Directive issued by the Montana Governor on March 30, 2020, at the outset of the Covid pandemic, in effect, modified the Leases by temporarily limiting certain evictions. The bankruptcy court rejected that argument because the Directive applied to residential evictions only. The Andersons have not included this argument in their opening brief, and it is waived.

14

Leases and Mont. Code Ann. § 77-6-506(1), and therefore the Andersons have no interest in the Leases.

In its memorandum of decision, the bankruptcy court did not comment more than in a cursory fashion about the alleged material disputed facts asserted by the Andersons. It focused on the Andersons' failure to plead a claim for breach of the contractual implied covenant of good faith and fair dealing in the complaint. It noted that "[t]he only explicit references to the covenant of good faith and fair dealing in the operative complaint are found at paragraph 63" which was a single sentence stating "[e]very contract, regardless of type, contains an implied covenant of good faith and fair dealing." The bankruptcy court acknowledged that under Montana law, every contract includes an implied covenant of good faith and fair dealing which requires honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade citing Mont. Code Ann. § 28-1-211. But the bankruptcy court disagreed with the Andersons that the facts alleged in the complaint put the DNRC on sufficient notice that they were seeking damages for breach of the implied covenant separate and apart from breach of contract. It said that other than the allegations in the section entitled Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing which was dismissed, the complaint does not allege dishonesty or unreasonableness, only that the DNRC's conduct deviated from the contract. The bankruptcy court noted

15

also that the Andersons had ample opportunity to amend the complaint and did not.

The bankruptcy court added that even if the claim was properly pled, the implied covenant cannot modify the plain language of contracts and state law. It stated that "[i]mplied terms 'should never be read to vary express terms.' Hence, under Montana law, [i]mplied contractual provisions 'will not be applied where . . . express provisions govern,'" citing *Tvedt v. Farmers Ins. Group of Cos*, 321 Mont. 263, 273, 91 P.3d 1, 8 (Mont. 2004).

The bankruptcy court added that even if *Tvedt* did not apply, the Andersons' version of the facts did not lead to a conclusion that the DNRC acted dishonestly or unreasonably, noting that it offered the Andersons an opportunity to reinstate the Leases.

The bankruptcy court entered its order on November 28, 2022. This appeal was timely filed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(1) and (b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Did the bankruptcy court err in denying the Andersons' motion for summary judgment and in granting the two DNRC motions for summary judgment?

16

## STANDARDS OF REVIEW

We review the bankruptcy court's grant of summary judgment de novo. *Johnson v. Nielson (In re Slatkin)*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted). The bankruptcy court's interpretation of a statute is a pure issue of law which is also reviewed de novo. *Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021).

"De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014) (citations omitted). When we review a matter de novo, we give no deference to the bankruptcy court's decision. *Id.*

An order staying discovery is reviewed for an abuse of discretion. *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988) (citations omitted). To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, we consider whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 & n.21 (9th Cir. 2009) (en banc).

## DISCUSSION

**A.   The bankruptcy court did not err in finding on summary judgment that the last day for payment of the grazing Leases was April 1.**

**1.   Legal standard for motion for summary judgment under Civil Rule 56**

Summary judgment may be granted by the trial court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Civil Rule 56(a), as incorporated by Rule 7056; *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 707 (9th Cir. 2008). A trial court may not weigh the evidence in resolving such motions, but rather must determine only whether a material factual dispute remains for trial. *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997). Only disputes over facts that might affect the outcome of the lawsuit may defeat a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then the dispute over a material fact is genuine. *Id.*

**2.   The bankruptcy court did not err in ruling that the due date for the rent was April 1, 2020.**

Construction and interpretation of a contract is a question of law, *Whary v. Plum Creek Timberlands*, L.P., 374 Mont. 266, 269, 320 P.3d 973, 976 (Mont. 2014), which we review de novo. Our review of the Leases, the Cash Lease Agreements, the assignments, the referenced Montana state law and

18

regulations, leads us to agree with the bankruptcy court's determination that the grazing rent was due no later than April 1, 2020. The Andersons concede the full payment was not timely (or ever) made nor were the conditions to the offer by the DNRC to reinstate the then cancelled Leases met.

As the bankruptcy court noted, "[a]nalysis of a contract begins with its plain language. Mont. Code Ann. § 28-3-401. That means, 'where the language of an agreement is clear and unambiguous, and as a result, susceptible to only one interpretation, the court's duty is to apply the language as written.'" *Rich v. Ellingson,* 340 Mont. 285, 291, 174 P.3d 491, 495 (Mont. 2007).

We agree with the bankruptcy court's rejection of the Andersons' three arguments that the DNRC breached the Leases.

First, the plain language of the Cash Lease Agreements is clear and unambiguous. The rent required to be paid in that one-page contract was for enrollment into the CRP, and nothing else. The document states that the rent is in addition to the rent to be paid under the grazing and agricultural leases. There is no ambiguity. The Andersons' argument that the parties intended to modify the Leases when entering into the Cash Lease Agreements is belied by the plain language of the two documents.

Second, the Andersons' argument that the United States was in fact a lessee under the Leases because of the assignments is misplaced. The Leases were not modified by the Montana legislature in Mont. Code Ann. §

77-6-506(1). The United States was not a lessee of the 3,000 plus acres based again on the plain language of the Leases. The assignments at most were agreements intended by the United States and the Andersons to take effect at some unspecified later time if, and when, the United States actually foreclosed on its collateral, the Leases. The fact that the assignments were recorded, were or were not "effective," and gave inchoate rights to the United States under its agreements with the Andersons did not make the United States a lessee of the lands.

Third, the Andersons' argument that even if the United States is not the lessee, the United States is involved as the lessee, must also fail. They would have us read the statute to say that it applies anytime the United States is involved in some way in a lease rather than is "involved as a lessee." They offer no authority that this was the intent of the Montana legislature. And our research has uncovered nothing that would support the Andersons' argument. The Andersons' position would lead to a conclusion that anytime the United States obtains a security interest in a lease of Montana land, the United States is "involved as a lessee," thereby modifying the plain language of a written contract. We require unambiguous Montana authority before we can accept the Andersons' arguments on this issue.

**3.    The bankruptcy court did not err by determining that breach of the contractual implied covenant of good faith and fair dealing was not properly pled, and even if properly pled, the implied covenant was not breached.**

**a.  The complaint, as amended by removal of the *tortious* breach of the contractual implied covenant of good faith and fair dealing claim, did not give the DNRC fair notice that the Andersons intended to continue with a claim for *contractual* breach of the implied covenant.**

The bankruptcy court made few comments on the various purportedly material facts argued by the Andersons to support their position that the DNRC breached the implied covenant of good faith and fair dealing. Instead, the bankruptcy court focused on their failure to plead that claim for relief in their complaint either at the outset or by amendment, especially after they conceded that they could not proceed with the tortious breach and permitted that claim to be dismissed by the state court. The bankruptcy found that breach of contract and contractual breach of the implied covenant were "[distinct] theories . . . and represent different claims requiring different proof." It reasoned that not only was the implied covenant claim not pled but that "[n]othing in the Verified Complaint could be characterized as fairly providing notice that the Andersons were asserting a claim for contractual breach of the implied covenant of good faith and fair dealing sufficient that DNRC could prepare a responsive pleading."

The bankruptcy court acknowledged the existence of the implied covenant under Montana law citing *Story v. City of Bozeman*, 242 Mont. 436, 450, 791 P.2d 767, 775 (1990), *overruled in part on other grounds, Arrowhead Sch. Dist. No. 75 v. Klyap*, 318 Mont. 103, 79 P.3d 250 (2003). In *Story*, the

Montana Supreme Court ruled that in Montana, every contract includes the implied covenant of good faith and fair dealing, which requires honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade, citing Mont. Code Ann. § 28-1-211. *Story* noted that "[w]hen one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached. In the great majority of ordinary contracts, a breach of the covenant is only a breach of the contract and only contract damages are due." *Story*, 242 Mont. at 450.

The Andersons argued to the bankruptcy court and before this Panel that even if breach of the contractual implied covenant and breach of contract were separate claims, they need not be pled separately in the complaint citing Civil Rule 8(d)[10] which states in part that two or more "statements of a claim" may be made in a single count. They argue that "numerous allegations" put the DNRC on sufficient notice that they were being sued for, at a minimum, dishonesty and/or acts outside of accepted

---

[10] Civil Rule 8(d) states:

(d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.

(1) In General. Each allegation must be simple, concise, and direct. No technical form is required.

(2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

(3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.

commercial practices and thus the contractual breach of the implied covenant.

In any event, we agree with the bankruptcy court that the operative complaint did not give the DNRC sufficient notice of the Andersons' claims. As the Supreme Court stated, "the Rules require [] a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The Andersons' admission and consent to dismissal of the original claim for tortious breach of the implied covenant removed from the complaint the position that conduct outside and beyond the terms of the contracts was part of their claim. A reasonable reader of the complaint after that dismissal would likely assume that the facts alleging bad deeds extraneous to the terms of the contract were no longer relevant. Permitting the Andersons to proceed on what is, at a minimum, primarily a technical difference between what they dismissed and what they are now arguing is not authorized by Civil Rule 8(d).

We agree that not only did the complaint, what was left of it, not give the DNRC fair notice of the Andersons' claim and the grounds upon which it rested, but misled them into believing that the dispute from that point did not include claims for breach of the implied covenant in any sense. We agree that the Andersons should have amended the complaint at that point

23

(or some time promptly thereafter) to give the DNRC reasonable notice as is required.

> **b.**     **Even if the claim was properly pled and the Andersons' alleged facts are true, the implied covenant claim must fail.**

The bankruptcy court added that even if the claim was properly pled, Montana law provides that the implied covenant may not be read to vary the express terms of the contract. *Tvedt*, 321 Mont. at 273, 91 P.3d at 8. The bankruptcy court reasoned that the payment was required no later than April 1 and when it was not made, the lease was "cancelled" automatically.

In *Tvedt*, the plaintiff was an insurance agent for Farmers Insurance. After 22-23 years, Farmers terminated him "without cause." The written contract between them provided that the plaintiff could be terminated on 30-days notice without cause. The Montana Supreme Court affirmed the grant of summary judgment in favor of the defendant as to the breach of the implied covenant claim. It stated, "[w]e are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement." *Id.* "Thus, under Montana law, implied contractual provisions will not be applied where, as here, express provisions govern." *Id.*

> **c.**     **Even if the claim was properly pled, and the Andersons' alleged facts are true, the implied covenant was not breached.**

Finally, the bankruptcy court determined that even if the claim was properly pled, and assuming that the facts as the Andersons allege are true,

24

the covenant was not breached. We agree. *Jeppeson v. State of Montana*, 205 Mont. 282, 667 P.2d 428 (Mont. 1983), presented facts similar to the Andersons' case. Mr. Jeppeson had a lease with Montana, breached the lease and ultimately lost it. He accused the state of failing to cooperate with an assignment to a third party which would have helped him save the property. The Montana Supreme Court agreed that there were no facts showing that the government did anything intentionally wrong. Abuse must:

> not merely [be] an error in judgment, but perversity of will, prejudice, passion, or moral delinquency [citations omitted], but it does not necessarily imply wrong-doing or a breach of trust, or import bad faith [citations omitted]; it conveys, rather, the idea of acting beyond the limit of discretion [citations omitted]. . .

*Id* at 291.

The DNRC offered to reinstate the Leases on payment of the past due rent along with the statutory penalty. Even assuming that the Andersons did not receive the Reinstatement Letter until the time to reinstate had passed, the DNRC sent the letter to the address it had. There are no allegations that the DNRC knew that Mr. Anderson had moved his family to another location and did not check his mail for the two-month period. While the DNRC may at most have given mixed signals about the status of the lease payments and refused to accept late payments after the reinstatement offer was not met, there are no facts which establish that this conduct was dishonest, unreasonable or not in good faith and consistent

25

with reasonable commercial practices. The pandemic led to disruption of nearly all businesses and governmental practices but the DNRC did not unreasonably use the pandemic disruption or take advantage of it to do things designed to give it an unfair advantage over the Andersons.

> 4. **The bankruptcy court did not err by staying discovery, thus preventing the Andersons from conducting discovery, pending the outcome of the DNRC second motion for summary judgment.**

The Andersons argue that they had the right to conduct discovery in the adversary proceeding and the bankruptcy court erred in taking that right away from them. They argue that they would have taken various depositions and possibly obtained facts to support their positions but the bankruptcy court improperly prevented them from doing so. The Andersons argue that the bankruptcy court abused its discretion in staying discovery, but do not argue that the bankruptcy court failed to identify the correct legal rule. They argue that the court's application of the rule was illogical and without support in inferences that may be drawn from the facts in the record. We disagree.

Civil Rule 56(d) provides a right to discovery before a court rules on a summary judgment motion if the nonmoving party "cannot present facts essential to justify its opposition." In *Jarvis v. Regan*, 833 F.2d 149, 155 (9th Cir.1987), the Ninth Circuit affirmed that the district court did not abuse its discretion in denying discovery when the complaint did not raise factual issues requiring discovery to resolve. As we agree with the bankruptcy

26

court that, irrespective of the facts, the Andersons cannot proceed with a claim for relief for breach of the contractual implied covenant of good faith and fair dealing, and that the Andersons breached the contract as a matter of law, any additional facts that might be uncovered by discovery would not have changed the result and therefore were unnecessary.

## CONCLUSION

For the reasons set forth above, we AFFIRM.